# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
August 11, 2015 Session

## MITCH GOREE, ET AL. v. UNITED PARCEL SERVICE, INC.

### Direct Appeal from the Circuit Court for Shelby County
### No. CT-003102-11  Jerry Stokes, Judge

---

### No. W2014-01468-COA-R3-CV – Filed October 8, 2015

---

This appeal involves two employees' claims of racial discrimination and retaliation pursuant to the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq*. After a five-day jury trial, the jury found in favor of both employees on their claims of racial discrimination and retaliation for engaging in protected activity. The jury awarded one employee $2,600,000 and the other employee $2,042,000 in back pay, benefits, and compensatory damages. The trial judge granted the employer's motion for remittitur of the jury verdict and suggested remittitur of the awards to $1,225,933.33 and $676,000, respectively. The plaintiffs accepted the remittitur under protest. The employer appeals, claiming that the trial court should have granted its motion for judgment notwithstanding the verdict because the plaintiffs failed to establish essential elements of their claims. Alternatively, the employer argues that a new trial is necessary due to erroneous jury instructions. The employees argue that the trial court erred in reducing the jury verdict. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part, Reversed in part and Remanded

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Waverly D. Crenshaw, Jr. and Marcus M. Crider, Nashville, Tennessee, for the Appellant/Cross Appellee, United Parcel Service, Inc.

Andrew C. Clarke, Memphis, Tennessee, and Luther O. Sutter, Benton, Arkansas, for the Appellees/Cross-Appellants, Mitch Goree and James Wherry.

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Plaintiffs Mitch Goree and James Wherry are long-time employees of United Parcel Service, Inc. ("UPS"). Both are black males. Goree began working for UPS in 1982. After several promotions, he achieved the title of business manager in 2000. A business manager is responsible for everything that goes on in a particular business unit or location and oversees the package preload employees, drivers, and supervisors. After failing a safety audit, Goree was demoted from his position as business manager in 2004. In 2005, Goree filed a lawsuit against UPS alleging racial discrimination, but his suit was eventually dismissed. For the next several years, Goree continued to work as a supervisor at various facilities in Memphis.

Plaintiff James Wherry began working for UPS around 1983. Wherry was promoted to the position of division manager around 2006. A division manager is responsible for everything that goes on in a certain division and oversees all of the business managers in that division. Wherry served as the division manager for West Tennessee.

In 2010, a business manager position became vacant at the Walnut Grove package center in Memphis. Wherry had known Goree for about twenty years and asked him to serve as "acting" business manager until the vacant position was filled. Goree agreed and began serving as acting business manager at Walnut Grove.[1] Around this time, Wherry suggested to his superior, Midsouth district operations manager James Buchanan, that Goree should be promoted to the business manager position on a full-time basis. In August 2010, Goree, Wherry, and Buchanan (also a black male) met for lunch at a restaurant and discussed the vacant business manager position. According to Goree, Buchanan said that he was going to submit the necessary paperwork to promote Goree and that he should expect to be promoted in a couple of weeks. Goree left the meeting believing that he had been promoted and informed his wife that he would be receiving a substantial raise. He also told several fellow employees that he was getting the job.

On October 4, 2010, Buchanan called a meeting at the Walnut Grove package center and announced to all of the employees that the vacant business manager position would be filled by Brian Riley, a white male, who was transferring from another facility. Goree was embarrassed and humiliated and left work immediately. He took "stress

---

[1] It is common practice at UPS for vacant positions to be temporarily filled by employees serving in an "acting" role. The "acting" employees do not receive any additional compensation for the added responsibility, nor are they assured a promotion to the vacant position. Serving in an "acting" capacity simply benefits the employee with additional experience.

leave" and sought counseling before eventually returning to work six months later.

In the meantime, on January 19, 2011, two black employees at the Bartlett package center complained to their business manager that a white employee used "the n-word" with them in reference to Martin Luther King, Jr. Day. The business manager immediately called Wherry and asked him to come to Bartlett. Wherry suggested that they discuss the incident at a regularly scheduled division meeting the next day. The business manager arrived late to the division meeting the following morning and handed written statements to Wherry describing the incident. Wherry placed the statements in his planner and forgot about them. The following week, on Friday, January 28, Wherry received two more complaints about the same employee who used the racial slur in reference to Martin Luther King, Jr. Day. That evening, Wherry called the security department and directed the security supervisor to go to Bartlett the following Monday, January 31, to investigate. After an investigation, the employee received formal notice of his discharge on Monday, February 7. However, the collective bargaining agreement between UPS and the teamsters' union provides that UPS must provide the union and the affected employee with a copy of any discharge letter "within ten (10) working days from the day of management's knowledge of the infraction." The discharged employee filed a grievance with the union and was returned to work after a settlement for a time-served suspension.

After the employee filed a grievance, upper level management and human resource personnel commenced an investigation in order to determine why the ten-day disciplinary deadline was missed. Wherry was taken out of service pending the investigation. One to two days before he was removed from service, Wherry allegedly had a conversation with Ken Harms, the district president of UPS who oversees 18,000 employees in several states, regarding Goree's opportunity the previous summer to be promoted to business manager at Walnut Grove. According to Wherry, during this conversation, the district president told him that "we don't promote guys with litigation at this company, or lawsuits basically." Wherry did not report this statement to anyone.

Wherry was summoned to Nashville to meet with the Midsouth district Human Resources manager and the regional security manager on or about March 3, 2011, in connection with the investigation of the missed ten-day deadline. After an interview and further investigation, Wherry was demoted from the position of division manager to business manager on or about March 10, 2011, allegedly because of his delay in responding to the incident that occurred on Martin Luther King, Jr. Day. The decision to demote Wherry was made by the regional HR manager and the Midsouth district HR manager, both black males, in consultation with in-house counsel and subject to the ultimate approval of district president Harms, a white male.

3

Goree and Wherry filed this lawsuit against UPS on June 30, 2011, alleging racial discrimination and retaliation for protected activity pursuant to the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq*. The complaint alleged that Goree was promised a promotion to business manager by Buchanan and that the promotion was awarded to a lesser qualified white male who had not previously sued UPS. Plaintiffs alleged that Goree was denied the promotion on account of his race and because of his previous lawsuit. The complaint also alleged that Wherry had "consistently opposed" UPS's illegal discrimination against Goree and the manner in which Goree was treated. As a result, the complaint alleged, Wherry was falsely accused of misconduct and demoted. Wherry claimed he was demoted under circumstances in which similarly situated white employees were not demoted. Plaintiffs sought compensatory damages for lost wages, fringe benefits, humiliation, and embarrassment.[2]

A five-day jury trial was held in January 2014. UPS filed a motion for directed verdict at the close of Plaintiffs' proof and renewed its motion at the close of all the proof, but the motions were denied. The jury ultimately found that both Plaintiffs had proven by a preponderance of the evidence "all of the elements" of their claims for racial discrimination and retaliation for protected activity. The jury awarded Goree (who was not promoted) $600,000 for back pay and benefits and $2,000,000 in compensatory damages. The jury awarded Wherry (who was demoted) $1,042,000 in back pay and benefits and $1,000,000 in compensatory damages. After the verdict, UPS filed a motion for judgment in accordance with its previous motion for directed verdict, or in the alternative, for a new trial and/or remittitur of the jury verdict. The trial judge denied the motion for judgment in accordance with the motion for directed verdict or for a new trial but granted the motion for remittitur, suggesting a remittitur of Goree's back pay award from $600,000 to $125,933.33 and a remittitur of the verdict for his compensatory damages from $2,000,000 to $1,100,000. The trial judge suggested a remittitur of Wherry's back pay award from $1,042,000 to $126,000 and a remittitur of the verdict for his compensatory damages from $1,000,000 to $550,000. Plaintiffs accepted the remittitur under protest. UPS timely filed a notice of appeal.

## II. ISSUES PRESENTED

UPS presents the following issues for review on appeal:

1. Whether Goree failed to establish, as a matter of law, his claims for discrimination and retaliation under the Tennessee Human Rights Act

---

[2]Although the complaint also sought damages for medical expenses, the parties later stipulated that Plaintiffs would not seek to recover damages for medical expenses because they were covered by the Employee Retirement Income Security Act of 1974 (ERISA).

where:

    a. Goree's supervisor, Wherry, admitted Goree was not "Ready Now" for promotion;

    b. Goree admitted and UPS confirmed that no employee was promoted to the Walnut Grove Package Center Business Manager position he sought;

    c. Goree admitted and UPS confirmed that Brian Riley was already a Business Manager when he transferred to Walnut Grove;

    d. the UPS decisionmakers involved in the decision to transfer Riley had no knowledge of Goree's 2005 lawsuit against UPS at the time they made the transfer decision; and

    e. Goree offered no evidence the decision to transfer Riley was in any way related to his race or to his 2005 lawsuit against UPS.

2. Whether Wherry failed to establish, as a matter of law, his claims for discrimination and retaliation under the Tennessee Human Rights Act where:

    a. Wherry failed to act timely on a complaint of the use of a racial slur against two African American employees;

    b. Wherry knew he had to take action within ten working days of learning of the complaint in order to discipline the individual responsible;

    c. Wherry admitted he never read the written complaints provided by the employees to whom the "n" word was used;

    d. Wherry's delay and failure to communicate within the ten days prevented UPS from disciplining the individual responsible under the collective bargaining agreement;

    e. Wherry offered no evidence of similarly-situated individuals who engaged in the same or similar conduct but were not disciplined;

    f. the individual who made the decision to demote Wherry was in the same protected category;

    g. Wherry was replaced by someone in the same protected category; and

    h. Wherry did not engage in any protected activity prior to the decision to demote him.

5

3.      Whether the Trial Court committed reversible error when it declined to instruct the jury on the proper "but for" standard for retaliation claims as enunciated by the United States Supreme Court in *University of Texas Southwest Medical Center v. Nassar*, -- U.S. -- , 133 S.Ct. 2517 (2013).

4.      Whether the Trial Court committed reversible error when it improperly limited UPS's proposed jury instruction on the business judgment rule, thus allowing the jury to substitute its own judgment for that of UPS's.

Additionally, Plaintiffs raise the following issue in their posture as appellees:

5.      Whether the trial court erred in reducing the jury's verdict.

For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

## III.   DISCUSSION

The Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.*, is a comprehensive anti-discrimination statute. *Phillips v. Interstate Hotels Corp. No. L07*, 974 S.W.2d 680, 683 (Tenn. 1998). It was enacted to "[s]afeguard all individuals within the state from discrimination because of race, creed, color, religion, sex, age or national origin in connection with employment." Tenn. Code. Ann. § 4-21-101(a)(3). The THRA declares that it is a "discriminatory practice" for an employer to "discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin." Tenn. Code Ann. § 4-21-401(a)(1). The Act also provides that it is a "discriminatory practice" to "[r]etaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by this chapter or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter." Tenn. Code Ann. § 4-21-301(a)(1). Although Plaintiffs Goree and Wherry filed a joint complaint and have been jointly represented throughout this action, their claims are separate and independent. Goree and Wherry have each asserted a claim for racial discrimination and a claim for retaliation for protected activity under the THRA. We will address each plaintiff's claims separately.

6

### *A. Goree's claim for racial discrimination for failure to promote*

Disparate treatment cases of discrimination occur "'where an employer has treated a particular person less favorably than others because of a protected trait.'" *Maddox v. Tenn. Student Assistance Corp.*, No. M2009-02171-COA-R3-CV, 2010 WL 2943279, at *6 (Tenn. Ct. App. July 27, 2010) (quoting *Ricci v. DeStefano*, 129 S.Ct. 2658, 2672 (2009)). "A plaintiff asserting a claim of disparate treatment, or intentional discrimination based on race, can proceed to trial either by offering direct evidence that the employer's action was motivated by race, or by presenting circumstantial evidence sufficient to raise an inference of discrimination." *Paschall v. Henry Cnty. Bd. of Educ.*, No. W1999-0070-COA-R3-CV, 2000 WL 33774557, at *4 (Tenn. Ct. App. June 2, 2000). The direct evidence and circumstantial evidence methods are mutually exclusive; "a plaintiff need only prove one or the other, not both." *Id.* Direct evidence of intentional discrimination may include an acknowledgment by the employer of discriminatory intent. *Id.* at *4 (citing *Spann v. Abraham*, 36 S.W.3d 452, 464 (Tenn. Ct. App. 1999)). It can include conduct or statements by persons involved in the decision-making process. *Wilson v. Rubin*, 104 S.W.3d 39, 49 (Tenn. Ct. App. 2002). However, because direct evidence of an employer's discriminatory intent is seldom available, most plaintiffs proceed by offering circumstantial evidence that creates an inference of discrimination, utilizing the shifting burden of production framework developed by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* In the case before us, Goree concedes that he has no direct evidence of racial discrimination by UPS. Instead, he relies on the indirect method and circumstantial evidence in an attempt to create an inference of racial discrimination.

Using the indirect method, a plaintiff may establish a prima facie case of employment discrimination based on a failure to promote by proving by a preponderance of the evidence (1) that he is a member of a protected class, (2) that he applied and was qualified for a position for which the employer was seeking applicants, (3) that he was subjected to adverse employment action, *i.e.*, denied the promotion, and (4) the rejection occurred under circumstances giving rise to an inference of unlawful discrimination, in that his failure to be promoted was more likely than not based on consideration of impermissible factors. *Marpaka v. Hefner*, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008); *Bryant v. Tenn. Conference of United Methodist Church*, No. M2000-01797-COA-R3-CV, 2002 WL 661937, at *4 (Tenn. Ct. App. Apr. 23, 2002); *Silpacharin v. Metro. Gov't of Nashville & Davidson Cnty.*, 797 S.W.2d 625, 629 (Tenn. Ct. App. 1990).[3] "A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because

---

[3]As the Supreme Court noted in *McDonnell Douglas*, the underlying facts in discrimination cases "necessarily will vary," so "the specification above of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13.

we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). However, a prima facie showing under *McDonnell Douglas* "is not the equivalent of a factual finding of discrimination." *Id.* at 579. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that one or more legitimate, nondiscriminatory reasons existed for the challenged employment action. Tenn. Code Ann. § 4-21-311(e). If the defendant produces such evidence, "the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was not the true reason for the challenged employment action and that the stated reason was a pretext for illegal discrimination[.]" *Id.* However, "[t]he plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of intentional discrimination[.]" *Id.*

At the outset, we must address Plaintiffs' argument on appeal that "the elements of a prima facie case are irrelevant" because we are reviewing a jury verdict, and we must focus, instead, on the ultimate issue of discriminatory intent. Plaintiffs rely on *United States Postal Service Board of Governors v. Aikens*, in which the Court stated that when an employer "fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection," the *McDonnell Douglas* presumption "drops from the case," and the fact finder must decide the ultimate issue of whether the defendant intentionally discriminated against the plaintiff. *U.S. Postal Svc. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15 (1983). However, this does not mean that we never review the evidence regarding the plaintiff's prima facie case after a jury verdict. In a later case, the Supreme Court explained that "although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quotations omitted); *see also Frame v. Davidson Transit Org.*, 194 S.W.3d 429, 436 (Tenn. Ct. App. 2005) (quoting *id.*). Accordingly, we agree with Plaintiffs that "[w]hen reviewing the facts of a discrimination claim after there has been a full trial on the merits, we must focus on the ultimate question of discrimination rather than on whether a plaintiff made out a prima facie case." *Barnes v. City of Cincinnati*, 401 F.3d 729, 736-37 (6th Cir. 2005). "Nonetheless, the evidentiary underpinnings of a plaintiff's prima facie case are not irrelevant or insulated from our examination to aid our determination [of] whether the evidence is sufficient to support a finding of intentional discrimination." *Id.* (citing *Noble v. Brinker Intern., Inc.*, 391 F.3d 715, 725 (6th Cir. 2004)). The elements of the plaintiff's prima facie case "frequently are still relevant after the case has gone to the jury." *Noble*, 391 F.3d at 727 (quotation omitted). We are not obliged "'to pretend that

there is evidence supporting a prima facie case when in fact there is not.'" *Id.* (quoting *Barbour v. Browner*, 181 F.3d 1342, 1347 (D.C. Cir. 1999)). In sum, considering the ultimate issue of discrimination and inquiring into the sufficiency of the evidence "'does not differ markedly'" from inquiring into whether the plaintiff first submitted sufficient evidence to establish the elements of a prima facie case and then sustained his burden of proving that the defendant's reasons were pretextual. *Id.* at 727-28 (quoting *McNulty v. Citadel Broad. Co.*, Nos. 01–3902/4046, 2003 WL 500171, at *5 (3d Cir. Feb. 26, 2003)).

"Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors." *Reeves*, 530 U.S. at 148. These factors include "*the strength of the plaintiff's prima facie case*, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148-49 (emphasis added); *cf. Williams v. City of Burns*, 465 S.W.3d 96, 118 (Tenn. 2015) (explaining that for a claim of retaliation under the Tennessee Public Protection Act, when the *McDonnell Douglas* framework "falls away," the trial court must "look at all of the evidence, including evidence submitted by the plaintiff to establish his prima facie case" to decide the ultimate issue of retaliation).

On appeal, UPS argues that Goree failed to present a prima facie case of racial discrimination because he failed to offer any proof to allow a reasonable jury to conclude that he was the subject of an adverse employment action. UPS claims that no one was *promoted* to fill the vacant business manager position because the white male employee who ultimately filled the position was transferred from another facility where he was already a business manager. Thus, UPS argues that the trial court should have granted its motion for judgment in accordance with its motion for directed verdict on Goree's racial discrimination claim. For the same reason, UPS also argues that the jury's verdict on Goree's racial discrimination claim was not supported by material evidence.

Tennessee Rule of Civil Procedure 50.01 provides that a party may move for a directed verdict "at the close of the evidence offered by an opposing party or at the close of the case." Tennessee Rule of Civil Procedure 50.02 permits parties who have moved unsuccessfully for a directed verdict to move after an unfavorable verdict "'to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion for a directed verdict[.]'"[4] *Plunk v. Nat'l Health*

---

[4]The more common term for a "judgment in accordance with a motion for a directed verdict" is a "judgment notwithstanding the verdict" or "JNOV." *Payne v. CSX Transp., Inc.*, No. E2012-02392-SC-R11-CV, -- S.W.3d ---, 2015 WL 3991141, at *13 n.18 (Tenn. July 1, 2015). Tennessee Rule of Civil

*Investors, Inc.*, 92 S.W.3d 409, 412 (Tenn. Ct. App. 2002) (quoting Tenn. R. Civ. P. 50.02). When considering a Rule 50.02 motion, "'the standard applied by both the trial court and the appellate court is the same as that applied to a motion for directed verdict made during trial.'"[5] *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 509 (Tenn. 2012) (quoting *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 130 (Tenn. 2004)). We "take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion when there is any doubt as to the conclusions to be drawn from the evidence." *Id.* (quoting *Mercer*, 134 S.W.3d at 130-31). We do not weigh the evidence or evaluate the credibility of witnesses. *Plunk*, 92 S.W.3d at 412; *Spann*, 36 S.W.3d at 462.


A verdict should not be directed either during or after trial "except where a reasonable mind could draw but one conclusion" as to the correct verdict. *Mercer*, 134 S.W.3d at 131. Basically, a motion for judgment in accordance with a motion for directed verdict "'is the procedural device whereby the trial court substitutes its judgment for the jury's verdict to the contrary.'" *Payne*, 2015 WL 3991141, at *13 (quoting 4 Nancy Fraas MacLean, *Tenn. Practice: Rules of Civil Procedure Annotated* § 50:4-50:5 author's cmts. (Thomson/West 4th ed. 2005-2006)). "Such a judgment is based upon the opinion of the trial judge that, notwithstanding the pronouncement of the jury, the case did not sufficiently raise any issue which required jury determination." *Id.* A directed verdict is appropriate "'if there is no material evidence in the record that would support a verdict for the plaintiff[.]'" *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995) (quoting *Williams v. Brown*, 860 S.W.2d 854, 857 (Tenn. 1993)). "'To avoid a directed verdict under Tenn. R. Civ. P. 50, the nonmoving party must present some evidence on every element of its case—enough evidence to establish at least a prima facie case.'" *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) (quoting *Richardson v. Miller*, 44 S.W.3d 1, 30 (Tenn. Ct. App. 2000)). When no material evidence exists on one or more elements that the non-moving party must prove, a directed verdict is proper. *Id.* "Whether the trial court should have

---

Procedure 50.02 does not use the term "judgment notwithstanding the verdict." However, "there is no substantive difference" between the terms, which are used interchangeably. *Payne*, 2015 WL 3991141, at 13 n.18 (citing *Akers*, 387 S.W.3d at 508 n.12). *Tennessee Civil Procedure* suggests that it is more accurate to characterize the motion as "a post-verdict motion for a directed verdict." Robert Banks, Jr. & June F. Entman, *Tennessee Civil Procedure* § 12-1(c) (3d ed. 2009). "Under federal law, the same procedural mechanism is referred to as a 'judgment as a matter of law in a jury trial.'" *Payne*, 2015 WL 3991141, at *13 n.18 (citing Fed. R. Civ. P. 50).

[5] Appellate courts use the same standard for reviewing the denial of a Rule 50.02 motion that we use to review the denial of a Rule 50.01 motion for a directed verdict. *Plunk*, 92 S.W.3d at 412. We review a trial court's decision regarding a directed verdict *de novo*, applying the same standard as the trial court. *Biscan v. Brown*, 160 S.W.3d 462, 470 (Tenn. 2005).

directed a verdict presents [the appellate court] with the legal question of whether material evidence was introduced on every element sufficient to create a jury issue." *Id.*

In sum, a defendant asserting that a trial court should have directed a verdict in its favor must convince the appellate court that reasonable minds can reach only one conclusion, even after taking the strongest legitimate view of the evidence in favor of the plaintiff, indulging in all reasonable inferences in the plaintiff's favor, and disregarding the contrary evidence. *Flynn v. Shoney's, Inc.*, 850 S.W.2d 458, 459-60 (Tenn. Ct. App. 1992). We must decide "whether the record contains any material evidence supporting the essentials of the cause of action alleged." *Conatser*, 920 S.W.2d at 647.

UPS alternatively argues that the jury's verdict was unsupported by material evidence. Our supreme court recently summarized our standard of review of a jury verdict as follows:

> In reviewing the sufficiency of a civil jury verdict, we will set aside findings of fact by a jury "only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d); *see also Wilson v. Americare Sys., Inc.*, 397 S.W.3d 552, 558 (Tenn. 2013). To determine whether there is such material evidence, we "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009) (alteration in original) (quoting *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000) (internal quotation marks omitted)), *abrogated by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010). We do not re-weigh the evidence, *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 532 (Tenn. 2008), and do not recalibrate the jury's preponderance of the evidence assessment, *Barnes*, 48 S.W.3d at 704. The credibility of witnesses is the province of the jury, not appellate courts. *See, e.g., State v. Flake*, 88 S.W.3d 540, 554 (Tenn. 2002) ("Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence, are for the trier of fact; appellate courts do not reweigh the evidence or reevaluate credibility determinations."); *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994).

*Ferguson v. Middle Tenn. State Univ.*, 451 S.W.3d 375, 380 (Tenn. 2014).

Keeping these principles in mind, we consider the evidence presented at trial regarding whether Goree suffered an adverse employment action. The position of business manager at Walnut Grove became vacant in early 2010. Wherry (the division manager) asked Goree to fill in as acting business manager. Goree testified that Buchanan (the operations manager) promised to promote him during their lunch meeting in August 2010. In October 2010, Buchanan announced to the Walnut Grove employees that the business manager position would be filled by Brian Riley, a white male who was transferring from a UPS facility in Tullahoma, Tennessee. Before working in Tullahoma, Riley had worked as a supervisor at Walnut Grove, but he was transferred to the Tullahoma facility six to eight months before he was named business manager at Walnut Grove. At trial, Goree testified that Riley "was promoted and transferred to a business manager's position in Tullahoma" and served as the business manager there for several months. Goree acknowledged that Riley already held the title of business manager when he filled the vacant position at Walnut Grove. He explained that Riley was transferred from the business manager position at the Tullahoma facility to the business manager position at Walnut Grove. Wherry also testified that Riley was not promoted to fill the business manager position at Walnut Grove; Wherry was told that Riley already held the title of business manager in Tullahoma and was simply transferred. Based on this testimony, UPS claims that Riley's lateral transfer "prevents a finding, as a matter of law, that Goree suffered any adverse employment action," citing several cases from other jurisdictions. *See, e.g.*, *Hackney v. Perry*, 166 F.3d 332, 1998 WL 801490, at *2-3 (4th Cir. 1998) (concluding the plaintiff failed to show a prima facie case of age discrimination where the company canceled its announcement for a vacant position, placed a lateral transfer in the position without a promotion, and did not utilize a competitive selection process to fill the position, as the plaintiff "was not rejected within the meaning of *McDonnell Douglas*").

In response, Plaintiffs do not address the cases cited by UPS or the legal validity of UPS's position regarding lateral transfers. Instead, they claim that, in any event, they presented material evidence to support a finding that Riley did *not* actually hold the title of business manager at Tullahoma, and he *was* promoted to the position of business manager at Walnut Grove. Even though Goree and Wherry testified unequivocally that Riley was promoted to business manager when he was transferred to Tullahoma, and this fact was confirmed by numerous other UPS employees who testified at trial, one witness testified to the contrary. Plaintiff presented the videotaped deposition testimony of former UPS employee James Buchanan, who served as the Midsouth district operations manager during the period in question and allegedly promised the promotion to Goree during the lunch meeting. Buchanan did not testify at trial because he was no longer employed with UPS and lived in Texas. During his deposition, however, Buchanan testified that he interviewed several employees for the vacant business manager position

at Walnut Grove, including Riley. He recalled Riley's previous transfer from Memphis to a small town and the fact that Riley "was out there running that center" and "took responsibility for that center." However, he said, "I believe ultimately, when promotions did come up, realized [sic] we couldn't – couldn't keep him there. So he was *actually an acting manager*, wherever it was that I sent him." (Emphasis added.) Buchanan did not elaborate on this statement during his deposition. However, Goree presented this deposition testimony at trial and argued that it created a factual dispute as to whether Riley was already a business manager before he was transferred to Walnut Grove or whether he received a promotion at that time. On appeal, Goree continues to argue that "[Buchanan's] testimony alone is sufficient to refute UPS' arguments and provides material evidence to support the jury's verdict."

Considering the procedural posture of this case and our standard of review, we agree. When considering a motion for judgment notwithstanding a verdict, we are not permitted to reweigh the evidence or to emphasize evidence that opposes the nonmovant's position. *Walker v. CSX Transp., Inc.*, No. M2010-00932-COA-R3-CV, 2011 WL 578780, at *3 (Tenn. Ct. App. Feb. 16, 2011). We must disregard all evidence contrary to the nonmovant's position. *Plunk*, 92 S.W.3d at 413. "The command to 'discard all countervailing evidence' is designed to 'remove any conflict in the evidence.'" *Walker*, 2011 WL 578780, at *3 n.4 (quoting *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994)). Likewise, when reviewing the sufficiency of a jury verdict, we must "assume the truth of all evidence that supports the verdict" and "discard all [countervailing] evidence." *Ferguson*, 451 S.W.3d at 380. Consequently, it does not matter, for purposes of this appeal, that Buchanan's testimony was at odds with the remainder of the witnesses presented by UPS and even the testimony of Goree of Wherry.[6] Because of Buchanan's testimony, a reasonable jury could draw more than one conclusion regarding whether Riley held the position of business manager at Tullahoma or whether he was promoted to the position of business manager when he transferred to Walnut Grove. As a result, UPS was not entitled to a directed verdict because of this issue, and there is material evidence to support the jury's implicit finding of an adverse employment action.

Next, UPS argues on appeal that Goree failed to show any connection between his race and the decision to transfer Riley. UPS claims that it decided to place Riley in the position of business manager rather than Goree for sound business reasons. UPS points to Buchanan's deposition testimony that he did not consider Goree to be qualified for the

---

[6]We emphasize that this is not a case where a party is making an argument on appeal that they failed to raise at trial. Despite the testimony of Goree and Wherry, their attorney pointed out the deposition testimony of Buchanan in response to UPS's motion for directed verdict and argued that Buchanan's testimony created a factual dispute as to this issue.

business manager position due to poor job performance. UPS also claims that it was financially advantageous to transfer Riley to the vacant position because he was already a business manager, and therefore, UPS avoided incurring the additional salary and benefits of promoting another supervisor to the level of business manager.

We reiterate, however, that Goree was not required to provide direct evidence of racial discrimination in order to succeed on his claim. *Wilson*, 104 S.W.3d at 49. Because direct evidence of discriminatory intent is seldom available, most plaintiffs proceed by offering circumstantial evidence that creates an *inference* of discrimination. *Id.* Goree could establish a prima facie case of employment discrimination by proving (1) that he is a member of a protected class, (2) that he applied and was qualified for a position for which the employer was seeking applicants, (3) that he was subjected to adverse employment action, and (4) the rejection occurred under circumstances giving rise to an inference of unlawful discrimination, in that his failure to be promoted was more likely than not based on consideration of impermissible factors. *Marpaka*, 289 S.W.3d at 313; *Bryant*, 2002 WL 661937, at *4; *Silpacharin*, 797 S.W.2d at 629. To establish the fourth prong, a plaintiff can show that, after his rejection, the position remained open and his employer continued to seek applicants from persons of his qualifications.[7] *See McDonnell Douglas*, 411 U.S. at 802; *Frame*, 194 S.W.3d at 434 n.7.

Here, Goree testified that he trained Riley when Riley was promoted to supervisor at Walnut Grove in 2008, and Riley worked as a supervisor for less than two years before he was promoted to business manager in 2010. Goree had over 25 years of experience with UPS and was first promoted to supervisor in 1986. He had four years of previous experience as a business manager. In addition, the UPS business manager who oversaw both Goree and Riley when they were supervisors testified that Goree was "much more qualified" to act as business manager than Riley. Thus, we conclude that Goree established a prima facie case of employment discrimination.

Even though UPS offered legitimate, nondiscriminatory reasons for its decision to name Riley as business manager rather than Goree, the jury could reasonably conclude that the reasons given by UPS were not the true reasons for its action but were a pretext for illegal discrimination. This is especially so considering the conflict regarding whether Riley was actually promoted when he returned to fill the vacancy at Walnut

---

[7]UPS correctly points out that Wherry never put Goree's name on the "Ready Now" list that included employees who were deemed "ready" for a promotion. However, Wherry testified that when Riley was transferred out of Memphis and allegedly promoted, Riley was not on the "Ready Now" list either. Taking the strongest legitimate view of the evidence in Goree's favor and allowing all reasonable inferences in his favor, as we must at this stage of the proceedings, it is reasonable to infer that being on the "Ready Now" list was not an absolute prerequisite to promotion.

Grove, contrary to UPS's explanation. An employee may demonstrate that his employer's proffered reasons are pretextual by revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation. *Wilson*, 104 S.W.3d at 50-51. One common way to undermine the employer's proffered reason is to show that the stated reason has no basis in fact or is "factually false." *Versa v. Policy Studies, Inc.*, 45 S.W.3d 575, 581 (Tenn. Ct. App. 2000). "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Frame*, 194 S.W.3d at 437; *see also Reeves*, 530 U.S. at 147 ("it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation"); *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 202 (Tenn. Ct. App. 1999) ("Once a plaintiff establishes its prima facie case, this, along with disbelief of the defendant's proffered reasons for the negative employment action, will permit a finding of discrimination by the factfinder."). Once the employer's stated justification for the decision has been eliminated, "discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves*, 530 U.S. at 147. If the only reason an employer offers for its decision is a lie, "the inference that the real reason was a forbidden one . . . may rationally be drawn."[8] *Versa,* 45 S.W.3d at 582.

Here, UPS claims that it placed Riley in the business manager position at Walnut Grove because it was financially advantageous to avoid promoting another individual, like Goree, to the level of business manager and incurring the corresponding expense of increasing his salary and benefits. If this claimed financial advantage did not actually exist because Riley *was* promoted to the position at Walnut Grove, the jury could reasonably find that UPS's stated reasons were pretextual and that its true motivation was racial discrimination. In sum, taking the strongest legitimate view of the evidence, the record contains a legally sufficient evidentiary basis for a reasonable jury to infer that Goree was not promoted to business manager because of his race. The trial court did not err in declining to direct a verdict in favor of UPS.

### B. Goree's claim for retaliation based on failure to promote

Goree's retaliation claim was based on the allegation that UPS did not promote him to business manager at Walnut Grove because of his 2005 lawsuit against UPS in which he alleged racial discrimination. UPS argues that Goree failed to present sufficient evidence to sustain his claim for retaliation, and therefore, the trial court should have

---

[8]"That the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of race is correct. That remains a question for the factfinder to answer, subject, of course, to appellate review[.]" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993).

directed a verdict in its favor, and the jury's verdict is unsupported by material evidence.

The THRA prohibits retaliation against employees who oppose discriminatory practices in the workplace. *Ferguson*, 451 S.W.3d at 384. As relevant here, the Act provides that it is a "discriminatory practice" to retaliate or discriminate in any manner against a person because the person has made a charge, filed a complaint, or participated in any manner in any investigation, proceeding or hearing under the Act.[9] Tenn. Code Ann. § 4-21-301(a)(1). A claimant must prove the following four elements to prevail on a retaliation claim under the THRA:

> (1) that [the plaintiff] engaged in activity protected by the THRA;
>
> (2) that the exercise of [the plaintiff's] protected rights was known to the defendant;
>
> (3) that the defendant thereafter took a materially adverse action against [the plaintiff]; and
>
> (4) there was a causal connection between the protected activity and the materially adverse action.

*Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 29 (Tenn. 2011) (quoting *Allen v. McPhee*, 240 S.W.3d 803, 820 (Tenn. 2007) *abrogated on other grounds by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 783-84 (Tenn. 2010)).

For his retaliation claim, Goree contends that he submitted sufficient *direct* evidence of retaliation to avoid reliance on the *McDonnell Douglas* framework. We agree. If a plaintiff submits direct evidence of discriminatory intent or retaliatory motive in a case brought under the discrimination statutes, he may use the direct method of proof to establish his case instead of the *McDonnell Douglas* burden-shifting framework. *Williams*, 465 S.W.3d at 113 n.16 (Tenn. 2015) (citing *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 727-28 (7th Cir. 2013); *Frye v. St. Thomas Health Servs.*, 227 S.W.3d 595, 609-10 (Tenn. Ct. App. 2007); *Wilson*, 104 S.W.3d at 49)). "The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the '[employee] has his day in court despite the *unavailability* of direct evidence.'" *Gossett*, 320 S.W.3d at 784 (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)) (emphasis added). Accordingly, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of

---

[9]"An employee may have a valid retaliation claim even if the underlying discrimination claim fails." *Ferguson*, 451 S.W.3d at 381.

discrimination." *Trans World Airlines, Inc.*, 469 U.S. at 121. When a plaintiff has direct evidence of discrimination, "rather than proceed through the steps of the *McDonnell-Douglas* burden shifting, 'the case must proceed to trial for a determination of whether the proffered evidence is credible[.]'" *Paschall*, 2000 WL 33774557, at *4 (quoting *Yetts v. ITW-NIFCO, Inc.*, 50 F.Supp.2d 776, 783 (S.D. Ohio 1999)).

As noted above, direct evidence may include an acknowledgment by the employer of discriminatory intent. *Id.*; *see Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (recognizing that direct evidence can include "evidence from the lips of the defendant proclaiming his or her . . . animus"). For example, "a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent." *Nguyen v. Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Direct evidence does not require the fact finder to draw any inferences in order to conclude that unlawful discrimination or retaliation motivated the employer's decision. *Frye*, 227 S.W.3d at 609; *Paschall*, 2000 WL 33774557, at *4. In evaluating statements allegedly showing employer bias, courts may consider several factors, including whether the statements were (1) made by a decision maker; (2) in relation to the decision-making process; (3) proximate in time to the discriminatory act; and (4) not isolated, vague, or ambiguous. *Reed v. Am. Cellular, Inc.*, 39 F. Supp. 3d 951, 961 (M.D. Tenn. 2014) (citing *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002)); *Floyd v. Dover Elevator Co.*, No. 3:98-CV-648, 2000 WL 33359268, at *7 (E.D. Tenn. Mar. 24, 2000) (citing *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994)). None of the factors is individually dispositive, but they should be evaluated as a whole, taking all of the circumstances into account. *Reed*, 39 F. Supp. 3d at 961.

In the case at bar, Goree testified that he initially believed that Buchanan was the one responsible for Riley being named business manager at Walnut Grove. However, Goree said, he filed a formal complaint through the UPS grievance line after the announcement, and when discussing his grievance with an HR manager, he was told that "Buchanan was not the reason" he did not get promoted, "the district made a decision not to promote [him]." In addition, co-plaintiff Wherry testified that he had a conversation with Harms, the multi-state district president of UPS, regarding Goree's opportunity to receive the promotion to business manager, and during this conversation, the district president told him that "we don't promote guys with litigation at this company, or lawsuits basically." [10]

---

[10]UPS also argues on appeal that Goree failed to establish his retaliation claim as a matter of law because he offered no evidence that the individuals who made the decision to transfer Riley knew about Goree's 2005 lawsuit at the time of their decision. "Knowledge of an employee's protected activity can be shown by either direct or circumstantial evidence." *Ferguson*, 451 S.W.3d at 382. According to UPS, the

17

The statement allegedly made by Harms qualifies as direct evidence of retaliation, which, if believed, requires no inference to enable a fact finder to conclude that unlawful retaliation motivated the decision to deny Goree a promotion. The statement was in direct reference to the decision making process, made by someone meaningfully involved in the process, just a few months after the decision was made, and was unambiguous.

When the plaintiff has produced direct evidence of retaliation, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same employment decision absent the impermissible motivation. *Simns v. Maxim Healthcare Servs., Inc.*, No. 11-1052, 2013 WL 435293, at *8 (W.D. Tenn. Feb. 4, 2013) (citing *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002)) (analyzing a THRA retaliation claim); *Cunningham v. Windriver Mgmt. Grp., LLC*, No. 3:10-CV-00358, 2011 WL 4449657, at *4 (M.D. Tenn. Sept. 26, 2011) (citing *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 709 (6th Cir. 2008)) (same); *Ayala v. Summit Constructors, Inc.*, 788 F.Supp.2d 703, 715 (M.D. Tenn. Apr. 25, 2011) (same); *see also Barnes*, 48 S.W.3d at 708 (Tenn. 2000) *abrogated by Gossett*, 320 S.W.3d at 777 (discussing the direct evidence method under the Tennessee Handicap Discrimination Act (now known as the Tennessee Disability Act)).

At this stage, we must address UPS's issue regarding the appropriate standard of causation for a claim of retaliation brought under the THRA. UPS argues that the proper standard was set forth in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), which involved a claim for retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. According to UPS, the same standard should apply to a claim for retaliation pursuant to the THRA.

---

decision was made by a business planning unit consisting of several individuals, including Buchanan. UPS acknowledges Wherry's trial testimony that he told Buchanan about Goree's prior lawsuit. Still, UPS argues that Wherry's testimony is insufficient to establish that the decisionmakers had knowledge of the litigation at the time when the decision was made because, according to UPS, Wherry provided no indication as to when he told Buchanan about the lawsuit.

After carefully reviewing the testimony, however, it is apparent that Wherry's testimony provided a sufficient timeframe to enable the jury to find that Buchanan knew about Goree's lawsuit when the decision was made. Wherry testified that he told Buchanan about Goree's litigation before he put Goree's name on a certain requisition form. The requisition form was entered into evidence and reflects that it was electronically signed by Wherry on August 22, 2010. The record also contains an email authored by Buchanan, dated August 24, referencing the Walnut Grove vacancy and stating that he intended to interview at least three applicants for the position. It is reasonable to infer from this evidence that Buchanan was informed of Goree's prior lawsuit on or before August 22, and the decision to transfer Riley to Walnut Grove had not been made as of August 24. Therefore, Plaintiffs submitted sufficient evidence for the jury to conclude that at least one of the decisionmakers had knowledge of Goree's protected activity when the decision was made.

18

Both Title VII and the THRA prohibit an employer from retaliating against an employee who engages in protected activity, such as filing an employment discrimination lawsuit. In fact, one of the stated purposes of the THRA is to "[p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964, 1968 and 1972[.]" Tenn. Code Ann. § 4-21-101(a)(1). Our legislature "intended the THRA 'to be coextensive with federal law.'" *Parker v. Warren Cnty. Util. Dist.*, 2 S.W.3d 170, 172 (Tenn. 1999) (quoting *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 834-35 (Tenn. 1997)). Accordingly, "it is appropriate to examine federal law when analyzing issues under the Tennessee Human Rights Act." *Weber v. Moses*, 938 S.W.2d 387, 390 (Tenn. 1996) (citing *Bennett v. Steiner-Liff Iron & Metal Co.*, 826 S.W.2d 119, 121 (Tenn. 1992); *see also Spann*, 36 S.W.3d at 463 ("Tennessee courts may appropriately look to decisions of federal courts construing Title VII when analyzing claims under the Act.").

However, the Tennessee Supreme Court has repeatedly emphasized that we "are neither bound by nor limited by the federal law when interpreting our state's anti-discrimination statute." *Parker*, 2 S.W.3d at 172; *see also Ferguson*, 451 S.W.3d at 381 ("Generally, we interpret the THRA similarly, if not identically, to Title VII, but we are not obligated to follow and we are not limited by federal law when interpreting the THRA."); *Bredesen v. Tenn. Judicial Selection Comm'n,* 214 S.W.3d 419, 430 n.6 (Tenn. 2007) ("federal precedents are, of course, not binding on Tennessee courts and do not limit our ability to give the fullest possible effect to the Tennessee Human Rights Act"); *Washington v. Robertson Cnty.*, 29 S.W.3d 466, 473-74 (Tenn. 2000) ("this Court's interpretations of the THRA are not bound or limited by federal law"); *Phillips*, 974 S.W.2d at 684 (explaining that we "may look to federal interpretation of Title VII for guidance in enforcing our own anti-discrimination statute" but "are neither bound by nor limited by federal law when interpreting the THRA").

In *Nassar*, the United States Supreme Court defined the proper standard of causation for Title VII retaliation claims. *Nassar*, 133 S.Ct. at 2524. The anti-retaliation provision of Title VII states, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . *because* he has opposed any practice made an unlawful employment practice by this subchapter, or *because* he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a) (emphasis added). Construing the term "because," the Supreme

Court held that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Nassar*, 133 S. Ct. at 2528. "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 2533. The Court acknowledged that other types of discrimination claims under Title VII, such as those based on race, color, religion, sex, or national origin, can be proven according to a "lessened causation standard," in which plaintiffs can simply show that "'race, color, religion, sex, or national origin was *a motivating factor* for any employment practice, even though other factors also motivated the practice.'" *Id.* at 2526 (quoting 42 U.S.C. § 2000e–2(m)) (emphasis added). However, the Court rejected the argument that this lesser standard also applies to retaliation claims, due to the "plain textual meaning" of the word "because" in the anti-retaliation statute and the structure of the statute as a whole. *Id.* at 2534. In sum, the Court explained that a plaintiff making a retaliation claim under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.*

In a later case, the United States Supreme Court elaborated on the concept of but-for causation:

> "In the usual course," this requires proof "'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct." *University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. ——, ——, 133 S.Ct. 2517, 2525, 186 L.Ed.2d 503 (2013) (quoting Restatement of Torts § 431, Comment a (1934)). The Model Penal Code reflects this traditional understanding; it states that "[c]onduct is the cause of a result" if "it is an antecedent but for which the result in question would not have occurred." § 2.03(1)(a). . . .
>
> Thus, "where A shoots B, who is hit and dies, we can say that A [actually] caused B's death, since but for A's conduct B would not have died." [1 W. LaFave, *Substantive Criminal Law* § 6.4(a), pp. 467-68 (2d ed. 2003)] (italics omitted). The same conclusion follows if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back. Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived. *See, e.g., State v. Frazier*, 339 Mo. 966, 974-975, 98 S.W.2d 707, 712–713 (1936).
>
> This but-for requirement is part of the common understanding of

cause. Consider a baseball game in which the visiting team's leadoff batter hits a home run in the top of the first inning. If the visiting team goes on to win by a score of 1 to 0, every person competent in the English language and familiar with the American pastime would agree that the victory resulted from the home run. This is so because it is natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter. It is beside the point that the victory also resulted from a host of other necessary causes, such as skillful pitching, the coach's decision to put the leadoff batter in the lineup, and the league's decision to schedule the game. By contrast, it makes little sense to say that an event resulted from or was the outcome of some earlier action if the action merely played a nonessential contributing role in producing the event. If the visiting team wound up winning 5 to 2 rather than 1 to 0, one would be surprised to read in the sports page that the victory resulted from the leadoff batter's early, non-dispositive home run.

Where there is no textual or contextual indication to the contrary, courts regularly read phrases like "results from" to require but-for causality.

*Burrage v. U.S.*, 134 S. Ct. 881, 887-88 (2014). Thus, "but for" causation does not require a showing of sole causation.[11]

The anti-retaliation provision in the THRA contains language comparable to the Title VII provision, prohibiting retaliation against an employee "*because* such person has opposed a practice declared discriminatory by this chapter or *because* such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter." Tenn. Code Ann. § 4-21-301(a)(1) (emphasis added). The Tennessee Supreme Court has interpreted this language as requiring "a causal connection" between the employee's protected activity and the materially adverse action. *Ferguson*, 451 S.W.3d at 382;[12] *Sykes*, 343 S.W.3d at 29. The employee must show that the employer's action "was actually motivated by a desire to retaliate against the employee." *Allen*, 240 S.W.3d at 821. The court has said that "[i]n making a determination of whether a causal link exists between a protected activity . . .

---

[11]Tennessee courts also recognize that "in order to establish 'but for' causation, '[i]t is not necessary that the defendants' act be the *sole* cause of the plaintiff's injury, only that it be *a* cause.'" *Knight v. Flanary & Sons Trucking, Inc.*, No. W2005-01412-COA-R3-CV, 2006 WL 1767727, at *6 (Tenn. Ct. App. June 29, 2006) (quoting *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005)).

[12]In *Ferguson*, a post-*Nassar* case, the Tennessee Supreme Court noted that the four prongs of a retaliation claim under the THRA are the same four prongs identified by the Sixth Circuit for a retaliation claim under Title VII. *Ferguson*, 451 S.W.3d at 382 n.3 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990)).

and a materially adverse action taken by an employer, 'courts consider whether an employer's conduct can be linked to retaliatory intent.'" *Sykes*, 343 S.W.3d at 29 (quoting *Allen*, 240 S.W.3d at 822). The Tennessee Supreme Court has clarified that "a THRA claim does not require a showing of sole causation." *Id.* at 29, 32 (finding summary judgment inappropriate on a THRA claim for retaliation because "a reasonable jury could conclude that there was *a* causal connection" between the employees' protected activity and the employer's adverse action, even if not sole causation). However, the court has not otherwise articulated the precise parameters of the "causal link" that is required for a retaliation claim under the THRA. It has not directly discussed whether but-for causation is required.[13] "But-for" causation means that "the causal link between injury and wrong is so close that the injury would not have occurred but for the act." *Nassar*, 133 S.Ct. at 2522-23.

We believe that the Tennessee Supreme Court would adopt the reasoning of *Nassar* and require but for causation for a retaliation claim filed pursuant to the THRA, for several reasons. The pivotal language in the anti-retaliation provision of the THRA mirrors that used in Title VII – an employer cannot retaliate "because" of an employee's protected activity. Our legislature intended the THRA "to be coextensive with federal law," *Parker*, 2 S.W.3d at 172, and the Tennessee Supreme Court, although not bound by federal law, has, in its own words, generally interpreted the THRA "similarly, if not identically, to Title VII." *Ferguson*, 451 S.W.3d at 381. "The policy of interpreting the THRA coextensively with Title VII is predicated upon a desire to maintain continuity between state and federal law." *Parker*, 2 S.W.3d at 173. That goal would not be served by interpreting the identical language used in the two statutes differently.[14] Ultimately, our interpretation should be "influenced by the subject matter, the plain language, the

---

[13]The Tennessee Court of Appeals has said that for a THRA retaliation claim, "[a]n employee may establish the needed causal connection simply by proving that his or her protected activity was a substantial factor leading to the discharge." *DeVore v. Deloitte & Touche*, No. 01A01-9602-CH-00073, 1998 WL 68985, at *11 (Tenn. Ct. App. Feb. 20, 1998) (citing *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990); *Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 531 (6th Cir. 1989)).

In another case, the court of appeals considered a claim under the Public Employee Political Freedom Act and compared the language of that statute to the anti-retaliation provision of the THRA. *Gooch v. City of Pulaski*, No. M2006-00451-COA-R3-CV, 2007 WL 969398, at *2 (Tenn. Ct. App. Mar. 30, 2007). The court stated, "It is well established in Tennessee that a plaintiff relying on these statutes under the THRA need only show that participation in the protected activity was a motivating factor in the employer's discriminatory conduct." *Id.* at *6 (citing *Bruce v. W. Auto Supply Co.*, 669 S.W.2d 95, 97 (Tenn. Ct. App. 1984)). However, *Bruce* was an age discrimination case, not a retaliation case.

[14]We note that federal district courts in Tennessee have already applied the "but for" causation standard announced in *Nassar* to retaliation claims not only under Title VII but also under the THRA. *See, e.g.*, *Murphy v. AHF/Cent. States, Inc.*, No. 3:12-1193, 2014 WL 4384345, at *8 (M.D. Tenn. Sept. 3, 2014); *Hawkins v. Center for Spinal Surgery*, 34 F.Supp.3d 822, 841 (M.D. Tenn. July 29, 2014); *Dunn v. Auto. Fin. Corp.*, No. 3:11-CV-01079, 2013 WL 3335084, at *11 (M.D. Tenn. July 2, 2013).

legislative intent, and history of the particular statute." *Washington*, 29 S.W.3d at 473-74. We see nothing in these areas to command a different result than *Nassar*. The anti-retaliation provision in Title VII and the anti-retaliation provision in the THRA serve the same purpose. *Ferguson*, 451 S.W.3d at 381. Accordingly, we hold that a plaintiff making a retaliation claim under the THRA "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *See Nassar*, 133 S. Ct. at 2534.

Now we must address UPS's argument that the trial court's jury instruction was erroneous under *Nassar*. Our standard for evaluating jury instructions in civil cases is as follows:

> "Whether a jury instruction is erroneous is a question of law and is therefore subject to de novo review with no presumption of correctness." *Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 699 (Tenn. 2011) (citing *Solomon v. First Am. Nat'l Bank of Nashville*, 774 S.W.2d 935, 940 (Tenn. Ct. App. 1989)). Trial courts have "a duty to impart 'substantially accurate instructions concerning the law applicable to the matters at issue.'" *Id.* (quoting *Hensley v. CSX Transp., Inc.*, 310 S.W.3d 824, 833 (Tenn. Ct. App. 2009)). . . . In determining whether a jury instruction is substantially accurate, we review the charge in its entirety and consider it as a whole, and we will not invalidate an instruction that "'fairly defines the legal issues involved in the case and does not mislead the jury.'" *Id.* (quoting *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992)). Moreover, "[j]ury instructions are not measured against [a] standard of perfection." [*Akers*, 387 S.W.3d at 504] (first alteration in original) (quoting *City of Johnson City v. Outdoor W., Inc.*, 947 S.W.2d 855, 858 (Tenn. Ct. App. 1996)).

*Spencer v. Norfolk Southern Ry. Co.*, 450 S.W.3d 507, 510 (Tenn. 2014).

At trial, UPS requested the following jury instruction:

> Plaintiff Goree has the burden of proving that the decisionmaker not only knew that he had filed a prior lawsuit against the company, but he must also prove that the decisionmaker did not promote him because he filed a lawsuit in 2005. Goree must establish that his protected activity was a but-for cause of UPS's decision not to promote him. In other words, to establish

causation, Goree must prove that but for his 2005 lawsuit, he would have been promoted.

The trial court declined to give the requested instruction, noting that it was not in accordance with the Tennessee Pattern Jury Instructions. Instead, the trial court instructed the jury as follows:

> In order to establish a prima facie case of retaliation, a plaintiff must prove the following, Number 1, the plaintiff engaged in -- engaged, rather, in a protected activity. Number 2, the exercise of Plaintiff's protected Civil Rights was known to the defendant. Number 3, the defendant thereafter took an employment action adverse to the plaintiff. And Number 4, there was *a causal connection* between the protected activity and the adverse employment action. . . .
>
> . . . . The plaintiff claims that the defendant intentionally -- intentionally, rather, retaliated against him and after -- and because he engaged in a legally protected -- protected activity by opposing discriminatory practice by the defendant. To prove and win this claim of illegal retaliation, the plaintiff must prove by a preponderance of the evidence that the defendant intentionally took a materially adverse action against the plaintiff because of his own -- *because of* his opposing a discriminatory practice by the defendant. The plaintiff must prove that his opposing a discriminatory practice by the defendant was a determining -- *determining factor* in the adverse action.

(Emphasis added.)

Taken as a whole, we conclude that these jury instructions were substantially accurate and did not mislead the jury. Notably, the jury instructions contained precisely the same language used by the THRA, explaining that Goree was required to prove that UPS took adverse action against him "because" he opposed a discriminatory practice. The jury was also informed that Goree was required to prove "a causal connection" between the adverse action and his protected activity, which was a correct statement of the law according to the most recent pronouncements of the Tennessee Supreme Court. *See Ferguson*, 451 S.W.3d at 382; *Sykes*, 343 S.W.3d at 29. Finally, although the jury instruction did not contain the phrase "but for," it did inform the jury that Goree was required to prove that his opposition to a discriminatory practice was a "determining factor" in the adverse decision.

24

Other courts have held that "but for" causation can be demonstrated by showing that the employee's protected conduct was a determinative or determining factor in the decision. In *Wright v. St. Vincent Health Systems*, the Eighth Circuit explained:

> To establish causation, [the employee] must prove "the desire to retaliate was the but for cause of" her termination—that is, "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the [hospital]." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. ——, ——, 133 S.Ct. 2517, 2528, 2533, 186 L.Ed.2d 503 (2013); *see also Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1148 (8th Cir. 2008) ("To make out a retaliation claim, the plaintiff must show that the protected conduct was a 'determinative—not merely a motivating—factor' in the employer's adverse employment decision." (quoting *Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046, 1053 (8th Cir. 2007))).

*Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737-38 (8th Cir. 2013). The court went on to say, "[i]n light of *Nassar* and our precedent, it is now definitively established that the determining-factor standard logically must be met in [] Title VII [] retaliation cases." *Id.* at 738 n.5. Applying *Wright*, several federal district courts have likewise held that a Title VII retaliation claim requires proof that the desire to retaliate was "the but for cause" of the decision, meaning that the protected activity was "a determinative-not merely a motivating-factor" in the adverse employment decision. *Verby v. Paypal, Inc.*, No. 8:13-CV-51, 2014 WL 1689684, at *10 (D. Neb. Apr. 29, 2014); *Baggett v. Barnett*, No. 4:12CV00526 JLH, 2014 WL 55240, at *15 (E.D. Ark. Jan. 7, 2014); *Tomlin v. Washington Univ.*, No. 4:11CV1871 HEA, 2013 WL 5406484, at *14 (E.D. Mo. Sept. 25, 2013); *see also Smith v. Arkansas Military Dep't*, No. 4:12-CV-727-DPM, 2014 WL 2872033, at *2 (E.D. Ark. June 24, 2014) (requiring proof that the protected activity "wasn't just a motivating factor, but the determining one"). The Sixth Circuit has "referred interchangeably" to the "but for" and "determining factor" concepts and found no error in a jury instruction that did not "incant[] the words 'but for.'" *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1334 (6th Cir. 1994); *see also Morgan v. Stanley Works*, 857 F.2d 1475, 1988 WL 96582, at *2 (6th Cir. 1988) ("Alternative expressions of the determining factor concept are 'but for causation' or 'causation in fact.'") (applying Michigan law, quoting *Matras v. Amoco Oil Co.*, 385 N.W.2d 586, 589 (Mich. 1986)). Other courts have also used the terms interchangeably. *E.g.*, *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1010-11 (1st Cir. 1979); *Holzman v. Jaymar-Ruby, Inc.*, 916 F.2d 1298, 1304 (7th Cir. 1990) ("[the] argument that the district court should have used the words 'but for' in its causation instruction [which used 'determining factor'] is nothing more than a semantic quibble"); *Westmoreland v. Prince George's Cnty., Md.*, No. 09-

CV-2453 AW, 2013 WL 6629054, at *10 (D. Md. Dec. 17, 2013) (finding that a jury instruction on "determinative effect" adequately informed the jury of the but-for causation standard stated in *Nassar*); *Wholf v. Tremco, Inc.*, 26 N.E.3d 902, 912 (Ohio Ct. App. 2015) ("Under *Nassar*, the plaintiff must ultimately prove, by a preponderance of the evidence, that the plaintiff's protected activity was the determinative factor in the employer's adverse employment action."); *Mackay v. Acorn Custom Cabinetry, Inc.*, 127 Wash. 2d 302, 309, 898 P.2d 284, 287 (1995) (explaining that the "determining factor" standard in retaliation cases requires a showing of "but for" causation).[15]

"In general, a trial court should give a requested jury instruction if it is supported by the evidence, embodies the party's theory, and is an accurate statement of the law." *Ricketts v. Robinson*, 169 S.W.3d 642, 648 (Tenn. Ct. App. 2004) (citing *Tallent v. Fox*, 141 S.W.2d 485, 497 (Tenn. Ct. App. 1940)). However, "[w]here the trial court fully and fairly charges the jury on the applicable law, the denial of a special request for an additional jury instruction will not be reversed on appeal." *Id.* (citing *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 445 (Tenn. 1992)). Perhaps the instructions in the present case would have been more precise if they had explicitly stated that Goree was required to show that his protected activity was a "but for" cause of the adverse decision, meaning that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S.Ct. at 2533. However, the lack of such language did not cause the instructions overall to be an inaccurate statement of the law. Clearly, the jury was told to decide whether UPS made its decision "because" of Goree's protected activity, meaning that a "causal connection" existed, and that Goree's protected conduct was a "determining factor in the adverse action." The instructions fairly defined the legal issues and provide no basis for reversal. *See E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1076 (6th Cir. 2015) (finding that a retaliation instruction with "because of" and "causal connection" language sufficiently articulated the but-for causation standard required by *Nassar*).

Now, we must consider UPS's argument that the record does not contain material evidence to support the jury's ultimate conclusion that UPS did not promote Goree "because" he had filed a discrimination lawsuit. We conclude that the record contains sufficient evidence to support the jury verdict. As previously discussed, even though UPS claims that it had legitimate reasons for naming Riley to the business manager position at Walnut Grove rather than Goree, the jury could reasonably conclude that the reasons given by UPS were not the true reasons for its decision but were pretext for illegal discrimination or retaliation. "Credibility of witnesses plays a major role in

---

[15]UPS even argued in its motion for new trial that after *Nassar*, "the plaintiff has the burden of establishing that the retaliatory animus was the determinative, not merely motivating, factor."

retaliation cases, as the jury is in a unique position to observe the demeanor of witnesses and assess their credibility." *Ferguson,* 451 S.W.3d at 383. "Appellate courts are not in the business of second-guessing jurors and trial judges when it comes to factual determinations supported by material evidence." *Id.* The issue on appeal is not whether we would have made the same credibility assessments or findings of fact that the jury did in this case. *Id.* "The assessment of witness credibility and resolution of evidentiary conflicts was within the sole province of the jury." *Id.* at 383-84. Here, the jury could reasonably conclude that UPS's articulated reasons for failing to promote Goree were insufficient to rebut his direct evidence of retaliation in the form of the statement by Harms that UPS does not promote employees who have sued the company. Reasonable minds could reach different conclusions regarding whether UPS would have made the same decision regarding the promotion even in the absence of the retaliatory motive. Therefore, the trial court properly denied the motion for judgment notwithstanding the verdict, and material evidence exists to support the jury's conclusion on the retaliation claim.

Finally, UPS argues that the trial court erred in its instruction to the jury on the business judgment rule. UPS requested the following jury instruction on this issue:

> At all times, you must keep in mind that an employer is entitled to make business decisions for any reason, whether good or bad, so long as those decisions are not motivated by a race or alleged protected activity. Accordingly, UPS is entitled to make its own personnel decisions, however misguided they may appear to you, and can decide not to promote or to demote an employee for any reason that is not unlawful or for no reason at all. It is not your function as jurors to second-guess the decision UPS made with regard to Plaintiffs if those decisions were otherwise lawful. Likewise, you may not find for Plaintiffs and against UPS just because you may disagree with UPS's stated reasons for its decision not to promote Goree or to demote Wherry, or because you believe that those decisions were harsh or unreasonable. Instead, your function is to determine only whether, in making its decision to not promote Goree or to demote Wherry, UPS used race or Plaintiffs' alleged protected activity to reach its decision. It is within UPS's business judgment to treat parties differently, especially where they engage in different behavior.

The trial court gave the first sentence of the requested instruction but declined to give the remainder, concluding that the first sentence "states your point without spinning this in UPS's favor." We find no reversible error in this decision. Trial courts need not give a

special instruction if its substance is already covered in the charge. *Otis*, 850 S.W.2d at 445 (citing *Mitchell v. Smith*, 779 S.W.2d 384, 390 (Tenn. Ct. App. 1989)). The court's instruction was substantially accurate and did not mislead the jury.

## C. Goree's damages

Having considered and rejected each of UPS's challenges to the findings of liability on Goree's claims, we now turn to Goree's issues regarding damages. After finding that UPS discriminated and retaliated against Goree by denying him a promotion, the jury awarded Goree $600,000 for back pay and benefits and $2,000,000 in compensatory damages. UPS filed a motion for remittitur of the jury verdict, which the trial court granted, suggesting a remittitur of Goree's back pay award from $600,000 to $125,933.33 and a remittitur of the verdict for his compensatory damages from $2,000,000 to $1,100,000. Goree accepted the remittitur under protest and challenges the trial court's action on appeal.[16]

The Tennessee Supreme Court explained the trial judge's role in assessing a jury verdict in *Meals ex rel. Meals v. Ford Motor Co.*:

> The trial judge, charged with ensuring a fair trial, serves as an important check on a jury's discretion to award damages. One way the trial judge does this is by serving as the thirteenth juror. *Holden v. Rannick*, 682 S.W.2d 903, 904-05 (Tenn. 1984) (quoting *Cumberland Tel. & Tel. Co. v. Smithwick*, 112 Tenn. 463, 469, 79 S.W. 803, 804 (1904)). As thirteenth juror, the trial judge must independently weigh and review the evidence presented at trial to determine whether it preponderates in favor of the verdict and decide whether he or she agrees with and is satisfied with the jury's verdict. *See State v. Moats*, 906 S.W.2d 431, 433 (Tenn. 1995). . . .
>
> Generally, if the trial judge is not satisfied with the jury's verdict, the judge must set aside the verdict and order a new trial. *Jones v. Idles*, 114 S.W.3d 911, 914-15 (Tenn. 2003). If the trial judge's dissatisfaction, however, is based only upon the jury's award of damages, the trial judge may suggest a remittitur, which, if accepted by the plaintiff, would reduce

---

[16]Plaintiffs also argue on appeal that UPS waived "any argument concerning the jury award of economic damages" because UPS did not object at trial when testimony was presented regarding Plaintiffs' economic damages. We find no support for this assertion. UPS does not complain about the *admission* of evidence regarding economic damages; it complains that the jury's verdict was not supported by the evidence that was admitted.

the award to an amount the judge deems appropriate. *See Turner v. Jordan*, 957 S.W.2d 815, 824 (Tenn. 1997).

*Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 420 (Tenn. 2013) (footnotes omitted).  Tennessee Code Annotated section 20-10-102 grants the trial court the discretion to reduce a jury award where appropriate. *State ex rel. Tenn. Dep't of Transp. v. Jones*, No. M2014-00151-COA-R3-CV, 2015 WL 3929584, at *7 (Tenn. Ct. App. June 25, 2015) (*no perm. app. filed*).  It provides that a trial court may suggest a remittitur "when the trial judge is of the opinion that the verdict in favor of a party should be reduced." Tenn. Code Ann. § 20-10-102(a).  It also provides:

> The court of appeals shall review the action of the trial court suggesting a remittitur using the standard of review provided for in T.R.A.P. 13(d) applicable to decisions of the trial court sitting without a jury. If, in the opinion of the court of appeals, the verdict of the jury should not have been reduced, but the judgment of the trial court is correct in other respects, the case shall be reversed to that extent, and judgment shall be rendered in the court of appeals for the full amount originally awarded by the jury in the trial court.

Tenn. Code Ann. § 20-10-102(b).  When reviewing a trial court's adjustment of a jury verdict, "'[t]he role of the appellate courts is to determine whether the trial court's adjustments were justified, giving due credit to the jury's decision regarding the credibility of the witnesses and due deference to the trial court's prerogatives as thirteenth juror.'" *Bonner v. Deyo*, No. W2014-00763-COA-R3-CV, 2014 WL 6873058, at *5 (Tenn. Ct. App. Dec. 5, 2014) (*no perm. app. filed*) (quoting *Long v. Mattingly*, 797 S.W.2d 889 (Tenn. Ct. App. 1990)).

> [T]he appellate courts customarily conduct a three-step review of the trial court's adjustment of a jury's damage award.  First, we examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict. *Burlison v. Rose*, 701 S.W.2d [609,] 611 [(Tenn. 1985)].  Second, we examine the amount of the suggested adjustment since adjustments that "totally destroy" the jury's verdict are impermissible. *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d [142,] 148 [(Tenn. 1981)]; *Guess v. Maury*, 726 S.W.2d 906, 913 (Tenn. Ct. App. 1986).  Third, we review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment.  *See* Tenn.

29

Code Ann. § 20-10-102(b).

*Long*, 797 S.W.2d at 896. On appeal, Goree does not present any argument with regard to the first two factors of the three-step analysis set forth above. In fact, he concedes that there is "no issue with the first two factors, [and] the only thing for this Court to consider is whether the evidence preponderates against the trial court's adjustment."

At trial, the evidence regarding Goree's economic damages was sparse and scattered. However, we have pieced together the following facts from the testimony of various witnesses over the course of the five-day trial. Goree testified that he went on "stress leave" for about six months after he learned that he did not receive the promotion and said that he did not receive his salary during that time period. He estimated that his salary was around $7,100 per month. His co-plaintiff, Wherry, was asked "how happy" Goree was when he left the lunch meeting believing he had been promoted to business manager, and he responded:

> He was happy. I mean, you go from a supervisor, making one amount, to a manager, making a different amount. You -- you go from a supervisor getting -- for instance, I'll just throw out a number. Let's say you go from a supervisor getting $7,000 extra a year to a manager getting 14,000 extra a year.

Wherry testified that as division manager, he was responsible for setting employee raises according to the budget he was given for the employees in his division, and he did so "based on merit for the most part." Wherry was asked, "if Mr. Goree had received that position, of the business manager position, how much in stock and salary would he have gotten approximately?" Wherry responded, "Probably about twenty or twenty-five thousand more a year." Goree's wife testified that Goree was 51 years old at the time of trial. Goree testified that he has no intention of leaving UPS and plans to work until he is "maybe 65 or so, 70." He testified that his "retirement" will be "[a] lot less" if he retires as a supervisor rather than a business manager but also acknowledged that if he is successful in getting promoted to business manager or another position in the future, the numbers could be very different.

The trial judge instructed the jury, "For Plaintiff Goree's failure to promote claim, you may award him back pay and the present value of any lost employment benefits." During closing arguments, Plaintiffs' attorney asked the jury to award Goree $42,600 for the six months he missed work, $87,500 for back pay ($25,000 for his lost raise times

30

three and a half years), and future pay of $325,000, for a total, he suggested, of $416,760.[17]  The jury verdict form listed separate spaces for "Back Pay and Benefits" and "Compensatory Damages," and the jury awarded Goree $600,000 in "Back Pay and Benefits."  The trial judge proceeded as if the jury awarded Goree lost future earnings under the heading of "Back Pay and Benefits," as Plaintiffs' counsel had suggested.  When ruling on the motion for remittitur, the trial judge stated that Goree's evidence regarding damages for future pay was too "speculative in nature in terms of pay raises and stock options and future value and whether they would actually be given on a yearly basis."  To calculate back pay, the trial judge used $25,000 as "the high end" of the evidence regarding the raise Goree would have received.  Adopting the calculation suggested by UPS in its motion for remittitur, the trial court divided $25,000 by twelve months to reach the monthly loss for Goree due to the denial of the promotion, then multiplied that amount by the forty months leading up to trial, for a total of $83,333.33 in damages due to the lost raise.  The trial court also added $7,100 per month that Goree lost while on leave for six months, for a total back pay and benefit award of $125,933.33.

"The plaintiff bears the burden of proving damages to such a degree that, while perhaps not mathematically precise, will allow the jury to make a reasoned assessment of the plaintiff's injury and loss."  *Meals*, 417 S.W.3d at 419-20 (citing *Provident Life & Accident Ins. Co. v. Globe Indem. Co*., 3 S.W.2d 1057, 1058 (Tenn. 1928); *Overstreet v. Shoney's, Inc*., 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999)).  When considering a retaliatory discharge case involving an employee who was terminated from her job, the Tennessee Supreme Court recognized that awards of front pay are somewhat "problematic" and "inherently speculative."  *Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326, 331-32 (Tenn. 1996).  In these types of cases, "courts are invariably faced with two issues: (1) how to compensate a plaintiff for past injuries—those occurring between the date of the discharge and the date of trial; and (2) how to compensate for future injuries—those occurring after the trial."  *Id.* at 331.  The first issue is relatively straightforward, as back pay can be calculated as "the amount he or she would have earned during the period between the discharge and the trial."  *Id.*  Front pay is "a monetary award intended to compensate the plaintiff for the loss of future earnings," and because of its prospective nature, "front pay is inherently speculative."  *Id.* at 332.  "[T]he speculative nature of the front pay remedy carries just as much potential to shortchange the plaintiff as it does to grant it a windfall."  *Id.* at 333.  "In order to limit this speculativeness," courts consider, among other things, "the employee's future in his or her old job [meaning an estimation of what the employee could have earned in the old job if the discharge had not taken place]; [and] the employee's work and life expectancy[.]"  *Id.* at 332 (quoting *Sasser v. Averitt Exp., Inc.*, 839 S.W.2d 422, 434 (Tenn. Ct. App. 1992)).  We find these considerations relevant here as well.

---

[17]These suggested figures actually total $455,100.

In the case before us, the trial judge calculated Goree's back pay award at $125,933.33. It reduced the jury award of $600,000 to that amount in order to eliminate any award of future pay. As a result, the original award was reduced by $474,066.67. Goree argues on appeal that he presented sufficient evidence to support the jury's award of lost future benefits. The testimony at trial indicated that Goree intended to work at UPS for fourteen to nineteen additional years, if he worked until the age of 65 or 70. Utilizing the $25,000 yearly figure adopted by the trial court for its back pay award, this means that Goree would have earned between $350,000 and $475,000 in additional compensation as a business manager over nineteen years. This estimation of what Goree could have earned if he had received the promotion is right in line with the original jury verdict, which, the trial court found, included roughly $475,000 for future pay. We find insufficient evidence to support the trial court's elimination of the future pay award simply due to its speculative nature. We therefore reverse the trial court's remittitur and reinstate the original jury verdict of $600,000 for Goree's back pay and benefits. *See* Tenn. Code Ann. § 20-10-102(b).

Finally, we turn to Goree's argument that the trial court erred in reducing the jury verdict for his compensatory damages from $2,000,000 to $1,100,000. "The THRA provides broad remedies to prevailing parties," including damages for "humiliation and embarrassment." *Sneed v. City of Red Bank, Tenn.*, 459 S.W.3d 17, 26-27 (Tenn. 2014) (citing Tenn. Code Ann. § 4-21-311(b)). "This court has frequently said that damages for humiliation and embarrassment in Human Rights Act cases is peculiarly within the province of the jury subject to the rule of reasonableness." *Thompson v. City of LaVergne*, No. M2003-02924-COA-R3-CV, 2005 WL 3076887, at *13 (Tenn. Ct. App. Nov. 16, 2005) (citing *Forbes v. Wilson County*, No. 01A01-9602-CH-00089, 1998 Tenn.App. LEXIS 340 (Tenn. Ct. App. May 20, 1998); *McDowell v. Shoffner Indus. of Tenn., Inc.*, No. 03-A01-9301-CH-00030, 1993 WL 262846 (Tenn. Ct. App. July 13, 1993)). The amount of damages for humiliation and embarrassment "'necessarily depends on the articulation of personal shame experienced by the [employee] together with the jury's perception of his sensitivities.'" *Boone v. City of Lavergne*, No. M2010-00052-COA-R3-CV, 2011 WL 553757, at *11 (Tenn. Ct. App. Feb. 16, 2011) (citing *McDowell*, 1993 WL 262846, at *4). The analysis is subjective in nature but may include consideration of "the effect the discrimination has had on the plaintiff's personality, state of mind, family lifestyle, schedule, and sleeping and eating habits." *Id.*

At trial, Goree testified that he did not learn that Riley was being named business manager until Buchanan made the announcement at a center-wide meeting of all the employees. He had already told his wife and some co-workers that he was getting the job. When asked how embarrassed he was, Goree said, "It was pretty bad." When asked how humiliated he was, Goree responded, "I can't even explain it." Goree said he was

"shocked" and "didn't feel anything." He also said he was very angry at Buchanan because he had promised him the job and should have told him if he changed his mind. Goree testified that he did not sleep well and had crazy dreams. He said he was "[p]robably not pretty good" as a husband during that time. He saw doctors and psychiatrists at his wife's insistence and was "pretty bad" depressed. When asked if he was "medically ill," Goree responded, "That's correct."

Goree's wife testified that she met him in 2004, and he was happy, easy going, and liked to take trips, go to dinner, and see movies. She said he was "ecstatically happy" after his lunch with Buchanan, when he learned of the possibility that he could become business manager. She said his happiness disappeared when he came home during the middle of a work day and looked as if he had been teary or crying. She described him as "humiliated, embarrassed and completely overwhelmed" and said he became so angry at Buchanan that he got a gun and started screaming and threatening to shoot Buchanan. She testified that Goree saw their primary care doctor, who recommended counseling. She said that Goree received counseling "for a period of time" and was detached from the family, angry all the time, and just wanted to sit on the couch. She said that counseling "toned him down" but he still experienced anger issues even after returning to work. She said he did not show affection and no longer wanted to go out on dates "[u]nless [she] mentioned it." However, she acknowledged that his behavior and attitude were improving.

Appellate courts have reviewed several jury verdicts for humiliation and embarrassment under the THRA and similar Acts. In *Forbes*, 1998 Tenn.App. LEXIS 340, at *13, this Court suggested that a plaintiff's $250,000 award for humiliation and embarrassment be remitted to $75,000, where the plaintiff testified that she experienced "a complete mental and emotional breakdown" after a demotion, suffered from insomnia and emotional scarring, sought medical treatment and was prescribed medication, but she did not offer evidence that she was receiving any long-term treatment from professionals for her humiliation and embarrassment. We also considered that the plaintiff was "merely demoted" rather than terminated. *Id.* at *12. In *Barnes v. Goodyear Tire & Rubber Co.*, No. W2000-01607-COA-RM-CV, 2001 WL 568033, at *9 (Tenn. Ct. App. May 25, 2001), a case involving the Tennessee Handicap Act (now known as the Tennessee Disability Act), we affirmed a remittitur of a $150,000 award for humiliation and embarrassment to $75,000, finding the original award excessive where the employee testified that he was devastated and in a state of shock upon learning of his layoff, indicating "an overall disappointment and discomfort normally associated with losing a job," but without aggravating injuries or circumstances. In *Harris v. Dominion Bank of Middle Tennessee*, No. 01A01-9609-CH-00444, 1997 WL 273953, at *4 (Tenn. Ct. App. May 23, 1997), this Court suggested a remittitur of a $100,000 award for humiliation and

33

embarrassment to $20,000, where the discharged employee testified his termination was "pretty humiliating" and scary financially, and he did not want to be seen in public, but he did not have aggravated injuries or problems sleeping. We concluded that "the discomfort he felt was the same anyone would feel over losing a job." *Id.*; *see also Campbell v. Rust Eng'g Co.*, 927 F.2d 603, 1991 WL 27423, at *5-6 (6th Cir. 1991) (finding a $68,897 award for embarrassment and humiliation excessive and ordering a remittitur to $10,000, where the plaintiff testified that his layoff "hurt [him] quite a bit" and embarrassed him, but he suffered no aggravated injuries, only the normal disappointment associated with losing a job); *McDowell*, 1993 WL 262846, at *4 (finding material evidence to support an award of $47,840 as damages for humiliation and embarrassment); *Roberson v. Univ. of Tenn.*, 829 S.W.2d 149, 152 (Tenn. Ct. App. 1992) (finding material evidence to support $50,000 award to plaintiff with extreme stress, problems eating and sleeping, under the care of a physician for work-related emotional problems, taking medication, and who suffered two miscarriages).

We have also upheld some relatively larger awards. In *Thompson v. City of LaVergne*, 2005 WL 3076887, at *12-13, this Court affirmed a remittitur of a $450,000 award for humiliation and embarrassment to $300,000, where the employee was assigned to the midnight shift after investigating a complaint of sexual harassment and worked in that capacity for two years, experiencing a sense of despair, loss of faith in his job, a change in his personality at home to being short-tempered and withdrawn, an inability to attend family functions and change in sleeping patterns, a feeling that he was shunned by other officers, and a belief that his opportunity for advancement had been permanently damaged. In *Boone v. City of Lavergne*, 2011 WL 553757, at *12-13, we found material evidence to affirm jury verdicts for $350,000 and $300,000 for two employees' humiliation and embarrassment where one employee testified that his work was "hell," he was diagnosed with "depression anxiety" and placed on medication, feared for his safety, had difficulty getting out of bed, and lost thirty pounds in a matter of months; the second employee shut out his family, lost his relationship with his wife and children, sought counseling and was prescribed medication. We concluded that these plaintiffs' "injuries were more pronounced than simple disappointment and actually affected their health." *Id.* at *13.

Considering these same principles, we cannot say that the trial court erred in suggesting a remittitur of the jury's award of $2,000,000 for Goree's humiliation and embarrassment to $1,100,000, a reduction of 45 percent.[18] We agree with the trial judge that the original award was "outside the range of reasonableness." Although Goree's injuries were more pronounced than simple disappointment, in that he sought medical

---

[18]UPS does not seek a further reduction of the award on appeal.

treatment and counseling "for a period of time," he certainly did not suffer any aggravating injuries or circumstances to justify an award of $2,000,000. Besides Goree's acknowledgement that he was "medically ill," he did not present any evidence of a medical diagnosis in relation to his treatment, and he did not receive any long term treatment or medication. We reject Goree's argument that the trial court's remittitur should be reversed and accordingly affirm the award as modified by the trial court.

### D. *Wherry's claim for racial discrimination based on his demotion*

We now turn to an examination of Wherry's claim that he was demoted because of his race. According to UPS, Wherry was demoted because he failed to act in a timely manner after receiving notice of an egregious act of racial harassment in connection with Martin Luther King, Jr. Day. Wherry attempts to prove his claim for racial discrimination by circumstantial evidence and the *McDonnell Douglas* analysis. The steps for establishing a prima facie case are slightly modified when the case involves a demotion as opposed to a failure to promote. Wherry could demonstrate a prima facie case of racial discrimination by establishing that (1) he was a member of a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) he was either replaced by a person outside of the protected class or was treated less favorably than a similarly situated employee who is not a member of the protected class and who engaged in similar conduct. *Cf. Stewart v. Cadna Rubber Co.*, No. W2013-00670-COA-R3-CV, 2014 WL 1235993, at *8 (Tenn. Ct. App. Mar. 26, 2014) (*no perm. app. filed*); *Pierce v. City of Humboldt*, No. W2012-00217-COA-R3-CV, 2013 WL 1190823, at *10 (Tenn. Ct. App. Mar. 25, 2013) (*no perm. app. filed*); *Castro v. TX Direct, LLC*, No. W2012-01494-COA-R3-CV, 2013 WL 684785, at *5 (Tenn. Ct. App. Feb. 25, 2013) (*no perm. app. filed*); *Hartman v. Tenn. Bd. of Regents*, No. M2010-02084-COA-R3-CV, 2011 WL 3849848, at *7 (Tenn. Ct. App. Aug. 31, 2011).[19] UPS argues that Wherry failed to establish prong four above. After Wherry was demoted from the position of division manager, he was replaced by another black male; therefore, he cannot show that he was replaced by a person outside of the protected class. UPS also claims that Wherry failed to establish that he was treated less favorably than a similarly situated employee who is not a member of the protected class and who engaged in similar conduct.

---

[19]Although *Pierce*, *Castro*, and *Hartman* involved claims of gender discrimination, "[t]he same general analytical framework and allocation of the burden of proof is used for claims under both federal and state statutes, irrespective of whether the claim asserts discrimination on the basis of race, age, sex, or any other class protected under the Act." *Bundy v. First Tenn. Bank Nat'l Ass'n*, 266 S.W.3d 410, 416 (Tenn. Ct. App. 2007).

A plaintiff who seeks to rely on a similarly situated employee to establish a claim of discrimination is not required to show "an exact correlation" between the compared employee's situation and his own, but he is required to show that their situations "'were similar in all relevant respects.'" *Pierce*, 2013 WL 1190823, at *11 (quoting *Bobo v. UPS*, 665 F.3d 741, 751 (6th Cir. 2012)). To meet this element of proof, the plaintiff "'must make meaningful comparisons between [him]self and other employees who are similarly situated in all material respects.'" *Id.* (quoting *Spann*, 36 S.W.3d at 468). "[I]t is not necessary to show that the compared employee's situation was identical to that of the plaintiff." *Id.* However, "[t]he comparable employees should have held similar positions, dealt with the same level of supervision, and been subject to the same general employer-imposed work rules and requirements." *Id.* Also, the "similarly situated" individuals must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Castro*, 2013 WL 684785, at *6; *Versa,* 45 S.W.3d at 581.

Wherry claims that he has identified several similarly situated employees to satisfy this element of his prima facie case. First, he points to several other individuals who were involved with the investigation into the incident that occurred on Martin Luther King, Jr. Day but not demoted. He identifies Matthew Webb, a white male, who was an attorney and the vice president and/or labor division manager for the Midsouth district, consisting of Tennessee, Alabama, Mississippi, Louisiana, Florida, "and a small section of the Southwest." Webb's position was far superior to Wherry's position of division manager for West Tennessee, and Webb was employed in the labor division, unlike Wherry, who was in the package division. Accordingly, the two were not similarly situated because they had "substantially different job titles and responsibilities." *Hartman*, 2011 WL 3849848, at *8.

Wherry also points to David Ragsdale, a division labor manager who worked beneath Matthew Webb. His geographical area of responsibility was between Memphis and Nashville. As labor manager, Ragsdale was responsible for meeting with the local union to review employee grievances and supporting UPS operations when it came to disciplinary matters. Ragsdale was one of the managers involved in the decision regarding how to deal with the employee who used the racial slurs. Ragsdale was also involved in the negotiations between the union and UPS after the employee filed a grievance, and he was authorized to settle the matter on behalf of UPS. Again, Wherry is attempting to compare himself to someone with a substantially different job title, in a different department, with different responsibilities. *See id.* Furthermore, neither Ragsdale nor any of the other individuals involved in the investigation of the racial slurs "forgot" about the report of misconduct and failed to investigate or otherwise act on the complaint for over one week during the limited ten-day window. For instance, on the

very same date that Ragsdale learned of the racial slurs, February 3, he reported them to his superior manager. Plaintiffs also concede in their brief that "Ragsdale instructed [the employee's business manager] to terminate [the employee] on February 3, 2011." Thus, Ragsdale took action on the same date he learned about the incident.[20] He did not engage in the same or similar conduct without differentiating or mitigating circumstances that would distinguish his conduct or the employer's treatment of it. *See Castro*, 2013 WL 684785, at *6. "One 'relevant aspect' to be considered is whether the plaintiff's conduct and the conduct of the person to whom he compares himself are of 'comparable seriousness.'" *Bundy*, 266 S.W.3d at 419. The plaintiff has the burden to establish that the other employee's acts were of "comparable seriousness" to his own infraction. *Id.* Wherry failed to do so.

Wherry also attempts to compare himself to Josh Knolton, a white male who worked at the Bartlett facility when the racial slurs were made. Knolton was an on-car supervisor who filled in as acting manager for one week because his business manager was on vacation. He was not a manager in any permanent capacity and was not similarly situated to Wherry, the division manager for West Tennessee.

Wherry vaguely asserts, without any meaningful comparison, that "other comparators" would include district president Ken Harms, security division manager Tim Breedlove, and security regional manager Stan Purvis. Again, these individuals have substantially different job titles and responsibilities, and Wherry has failed to engage in any meaningful analysis to establish that these employees were similarly situated but treated differently because of their race.

Finally, Wherry also asserts that David Ragsdale engaged in "racist conduct" when he previously worked as a business manager, and yet he was only "disciplined the grand total of $150.00." At trial, a black female UPS employee testified that she was assigned to work at David Ragsdale's center at Oakhaven in Memphis when he was a business manager. She followed him to the center after meeting him at another facility,

---

[20]Wherry also argued at trial, and vaguely suggests on appeal, that the business manager who supervised the employee who made the racial slurs would qualify as a "comparator." He alleges that the business manager did not act in a timely manner in carrying out the instruction to terminate the employee, yet Wherry was the only person demoted. However, the business manager in question was also a black male, so any differential treatment between him and Wherry does not establish an inference of racial discrimination. *See Sawyer v. Memphis Educ. Ass'n*, No. W2006-00437-COA-R3-CV, 2006 WL 3298326, at *4 (Tenn. Ct. App. Nov. 14, 2006) (explaining that a plaintiff could not establish a disparate treatment discrimination claim, which means that individuals from a protected group are treated less-favorably than other individuals, by comparing his own treatment with that of other minority employees). If Wherry was treated differently than the business manager, it was not because of his race.

but when she arrived, she was unable to go through the security gate because Ragsdale did not wait for her to escort her through the gate. The employee claimed that the gate workers told her that Ragsdale said that "he was trying to get out of there before he had to sign that girl in and she's right behind me." The employee believed she was treated differently because she was black and complained about Ragsdale's behavior. Because Ragsdale was a business manager, the matter was investigated by division manager Wherry and by the district HR manager, who is also a black male. At trial, the HR manager testified that he did not believe that Ragsdale had engaged in racial discrimination, but he did find his actions inappropriate and impolite, in that Ragsdale "decided that it was more important for him to get into the building to jump on a conference call than it was to sign in his employee that's now going to be working for him." Wherry and the HR manager jointly agreed that Ragsdale should be denied a raise of $150. The HR manager testified that Wherry never suggested that Ragsdale should be demoted or terminated for his actions.

After reviewing the circumstances surrounding Ragsdale's situation, we conclude that Wherry has again failed to demonstrate that he was treated less favorably than a similarly situated employee who engaged in similar conduct. The incidents occurred while Ragsdale was a business manager and Wherry was a division manager. Also, the incidents do not involve similar conduct. There were "differentiating or mitigating circumstances" that distinguish Ragsdale's conduct and his employer's treatment of it. *Castro*, 2013 WL 684785, at \*6. Ragsdale allegedly hurried through a gate without signing in an employee so that she was required to wait for another employee to sign her in. Wherry failed to report an incident of racial harassment for over a week because he forgot about it, even though UPS was required to take action within ten days of his knowledge of the incident. When Wherry did report the incident, he failed to inform anyone of the fact that he had known about the situation for over a week. On these facts, no rational factfinder could conclude that Wherry was treated less favorably than a *similarly situated employee* who is not a member of the protected class and *who engaged in similar conduct*. None of these employees were similarly situated to Wherry in the relevant respects. *See Pierce*, 2013 WL 1190823, at \*11. Accordingly, Wherry has not demonstrated facts giving rise to an inference of racial discrimination. Because Wherry was not similarly situated to the aforementioned employees, simply claiming that he was treated differently than these employees is not sufficient to prove racial discrimination by UPS. As such, the trial court should have granted UPS's motion for judgment notwithstanding the verdict on Wherry's claim for racial discrimination. We reverse the judgment in favor of Wherry on his claim for discrimination on account of his race.

### E. Wherry's claim for retaliation based on his demotion

Finally, we turn to Wherry's claim for retaliation for protected activity.[21] The THRA prohibits retaliation against an employee "because such person has opposed a practice declared discriminatory by this chapter *or* because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter." Tenn. Code Ann. § 4-21-301(a)(1) (emphasis added). Unlike Goree, Wherry had not filed a previous lawsuit against UPS. However, he basically claims that he engaged in "protected activity" by aligning himself with Goree. As we noted when discussing Goree's retaliation claim, in order to prevail on a retaliation claim under the THRA, a claimant must prove: (1) that the plaintiff engaged in activity protected by the THRA; (2) that the exercise of the plaintiff's protected rights was known to the defendant; (3) that the defendant thereafter took materially adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and the materially adverse action. *Sykes*, 343 S.W.3d at 29 (quoting *Allen*, 240 S.W.3d at 820). Wherry claims that his "aggressive advocacy of Goree was protected activity." Wherry testified that after the lunch meeting he attended with Goree and Buchanan, when the vacant business manager position was discussed, Buchanan asked Wherry to send him a requisition form with Goree's name on it. Wherry then had the following discussion with Buchanan about Goree's prior lawsuit against UPS:

> I told James [Buchanan], I said: James, to get -- I said: James, us to date, before we put Mitch [Goree's] name on a requisition, I said, I don't need -- I -- I just got promoted, first black guy in this city to get to be a division manager. I said: I want to keep moving up in the company. I don't need no concerns. I said: I want you to know now before you put Mitch name on that list, he got litigation -- he had litigation with this company. Whenever you put a guy name on the -- a requisition with litigation, it don't look good.
>
> James told me: You let me worry about that. You put his name on the list, on -- on the requisition. I got the rest of it.
>
> I said: Okay.[22]

---

[21]The trial court deferred ruling on UPS's motion for directed verdict on Wherry's retaliation claim and took the matter under advisement until the conclusion of the proof. It then denied the motion "with reluctance" and submitted the case to the jury.

[22]At another point during his testimony, Wherry described this conversation as follows:

> I said: James, Mitch got -- had litigation with UPS. We put his name on this requisition,

Wherry testified that when he learned Riley would be named business manager, he told Buchanan and others that Riley was "not the guy for the job" and that he could not handle the position of business manager. Finally, Wherry testified that he discussed Goree's situation with district president Harms, and Harms allegedly said, "We don't -- we don't promote guys with litigation at this company, or lawsuits basically." Wherry did not challenge Harms in response to this statement, nor did he report the statement to anyone.

Only certain retaliatory conduct violates the THRA. *Sawyer*, 2006 WL 3298326, at \*6. Because Wherry has not participated in a lawsuit or proceeding under the THRA, he must demonstrate that UPS retaliated against him because he "opposed a practice declared discriminatory by [the THRA]." Tenn. Code Ann. § 4-21-301(a)(1). General work-related grievances that are not related to discrimination cannot be the basis of a retaliation claim under the THRA. *Moore v. Nashville Elec. Power Bd.*, 72 S.W.3d 643, 656 (Tenn. Ct. App. 2001). As such, Wherry did not engage in protected activity simply by telling his superiors that Riley was "not the guy for the job." *See, e.g.*, *Willoughby v. Allstate Ins. Co.*, 104 F.App'x 528, 531 (6th Cir. 2004) (finding no protected activity where the employee merely contested the correctness of a decision made by his employer rather than asserting discrimination).

We also conclude that Wherry did not engage in protected activity in connection with his conversation with Harms. Even though Wherry testified that Harms made a statement indicating retaliatory intent, Wherry did not testify about his response to the statement other than to say that he did not report it to anyone because he thought it would be futile.[23] Thus, he did not engage in "protected activity" simply by hearing the statement made by Harms. The term "oppose" in this context carries its ordinary meaning: "to resist or antagonize . . . ; to contend against; to confront; resist; withstand." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (citing *Webster's New Int'l Dictionary* 1710 (2d ed. 1958)). We find no evidence

---

it's going to be concerns. I don't need my name associated with concerns.

    He said: Let me worry about that. I'm your boss.

    I said: Okay.

[23]We note that Plaintiffs' brief on appeal describes various other statements that were supposedly made by Harms and by Wherry during this alleged conversation. Plaintiffs' attorney also mentioned these additional statements in his argument to the trial judge in response to UPS's motion for directed verdict, stating that it was "[his] recollection of the testimony" that these statements were made. However, after reviewing the *trial testimony* regarding this conversation, we find no *evidence* of these additional statements in the record. Plaintiffs' brief does not provide any citations to the record as to where the evidence of these additional statements can be found. Of course, statements in briefs and statements of attorneys are no substitute for evidence in the record.

that Wherry "opposed" the discriminatory statement by Harms.[24]

Wherry's conversation with Buchanan, though, presents a closer case. Wherry told Buchanan, his superior, that he did not want any "concerns" due to his submission of a requisition form for Goree to be named business manager, considering the fact that Goree had prior litigation against the company. He suggested that recommending someone with prior litigation "don't look good." "When an employee communicates to [his or] her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *Crawford*, 555 U.S. at 276 (quotations omitted). Wherry's self-serving statement may be at the outer limit of what we would consider "opposing" a discriminatory practice. However, viewing the evidence in the light most favorable to Plaintiffs, we consider Wherry's statement to Buchanan to be some scant evidence from which a trier of fact might reasonably conclude that Wherry engaged in conduct protected by the THRA by speaking out against allegedly discriminatory behavior.

Still, this does not end the inquiry. In order to prevail on his retaliation claim, Wherry was also required to establish that "there was a causal connection between the protected activity and the materially adverse action." *Sykes*, 343 S.W.3d at 29. Ultimately, he was required to show that UPS retaliated against him "because" he opposed a practice declared discriminatory by the THRA. Tenn. Code Ann. § 4-21-301(a)(1). As previously discussed, under the standard announced in *Nassar*, a plaintiff making a retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," meaning that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533-34. UPS argues that Wherry failed to demonstrate any causal connection between his "advocacy" for Goree and his subsequent demotion.

Once the *McDonnell Douglas* framework falls away and the trier of fact is left to determine the ultimate issue of retaliation, "the question becomes whether the plaintiff has established that it is more likely than not that the employer's proffered reason 'is mere pretext and thus a coverup' for the employer's true retaliatory motive." *Williams*, 465 S.W.3d at 118 (quoting *Barry v. U.S. Capitol Guide Bd.*, 636 F.Supp.2d 95, 102-03

---

[24]We reject Wherry's argument that he produced direct evidence of retaliation against *him* by pointing to Harms' statement that "we don't promote guys with litigation." Direct evidence does not require the fact finder to draw any inferences in order to conclude that unlawful retaliation motivated the employer's decision. *Frye,* 227 S.W.3d at 609; *Paschall*, 2000 WL 33774557, at *4. The statement by Harms does not relate to the decision to demote Wherry or directly prove that UPS retaliated against Wherry.

(U.S.D.C. 2009)).   Pretext is typically shown by establishing that the employer's proffered reason has no basis in fact, that it did not actually motivate the decision, or it was insufficient to motivate the decision because other employees who engaged in substantially the same conduct were not demoted.  *Id.* at 119.  After taking into account any evidence that exposes weaknesses or inconsistencies in the employer's proffered explanation, the trier of fact must decide "whether the evidence as a whole gives rise to an inference that the employer's proffered non-retaliatory reason is pretextual."  *Id.* at 118.

> Circumstantial evidence that is pertinent and probative on the issue of causation and retaliatory intent includes, but is not limited to: (1) the temporal proximity of the adverse action to the complaint; (2) a pattern of workplace antagonism after a complaint; (3) an employer's failure to adhere to established company policy in dealing with the employee; (4) discriminatory treatment when compared to similarly situated employees; (5) evidence of a good work history and high or solid performance evaluations of the employee; (6) sudden and marked changes in an employee's performance evaluations after the exercise of the employee's protected rights; and (7) evidence tending to show that the employer's stated reason for discharge was false.

*Sykes*, 343 S.W.3d at 29-30 (citations omitted).

A brief recap of the timeline surrounding Wherry's demotion is helpful.  Wherry, Buchanan, and Goree met for lunch to discuss the vacant business manager position in August 2010.  In October 2010, Buchanan announced that Riley was getting the job. Goree immediately left work and did not return to work for about six months.   On Wednesday, January 19, 2011, while Goree remained on leave, two black employees at the Bartlett UPS facility complained to their business manager that a white employee used "the n-word" to them in reference to Martin Luther King, Jr. Day on two separate occasions.  The business manager at that facility immediately called Wherry, informed him that some of his employees "had words," and asked Wherry to come to the facility. According to Wherry, he asked the business manager's opinion as to whether anyone needed to be terminated, and the business manager said no.  Wherry suggested that they discuss the situation at a regularly scheduled division meeting the next day, which was Thursday, January 20.  The business manager arrived late to the division meeting the following morning and handed the employees' written statements to Wherry.  Wherry placed the statements in his planner and admittedly forgot about them.  The Bartlett business manager was on vacation the following week, but the acting business manager at Bartlett called Wherry on Friday, January 28 and complained about the same employee who used the racial slur in reference to Martin Luther King, Jr. Day.  The acting business

manager also asked Wherry to come to Bartlett. Another Bartlett employee also called Wherry that day and reported that the aforementioned employee was out of control. That evening as Wherry left Memphis, he called the security department and directed the security supervisor to go to Bartlett the following Monday, January 31, to investigate. He did not mention that he had known about the incident for over a week. After an investigation, the employee received formal notice of his discharge on Monday, February 7. However, the employee did not receive a copy of the discharge notice "within ten (10) working days from the day of management's knowledge of the infraction," as required by the collective bargaining agreement between UPS and the union. Again, Wherry had learned of the incident on January 19. Accordingly, the discharged employee filed a grievance and was returned to work after a settlement on February 28 for a time-served suspension.

Upper level management and human resource personnel commenced an investigation in order to determine why the ten-day disciplinary deadline was missed. Wherry was taken out of service around February 17, pending the investigation. One to two days before he was removed from service, Wherry allegedly had the conversation with district president Harms regarding Goree's opportunity to receive the promotion to business manager the previous summer, when the district president said "we don't promote guys with litigation at this company, or lawsuits basically." Wherry did not report this statement to anyone or voice any opposition to Harms.

On or about March 3, 2011, Wherry was summoned to Nashville to meet with the Midsouth district HR manager and the regional security manager in connection with the investigation of the missed ten-day deadline. After an interview and further investigation, Wherry was demoted from the position of division manager to business manager on or about March 10, 2011, allegedly because of his week-long delay in responding to the incident that occurred on Martin Luther King, Jr. Day.

In *Reeves*, the United States Supreme Court explained that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may permit* the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148 (emphasis added). However, the Court cautioned, "This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability." *Id.*

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other,

nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. [citations omitted] . . . To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'" *St. Mary's Honor Center*, supra, at 524, 113 S.Ct. 2742 (quoting *Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478 (1983)).

Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law. *See infra*, at 2110-2111.

*Id.* at 148-49. This Court recognized these same principles in *Frame v. Davidson Transit Organization*, 194 S.W.3d 429, 438 (Tenn. Ct. App. 2005).

We agree with UPS that Wherry simply failed to produce sufficient evidence from which a rational jury could conclude that the real reason for his demotion was retaliation based on his advocacy for Goree. Wherry does not dispute the basic facts. He was asked to come to Bartlett on January 19 because employees there "had words," but he did not go. He received written statements detailing the incident the next day but placed the documents in his planner and never read them. Wherry received two telephone complaints about the same employee on Friday, January 28, and was again asked to come to Bartlett because the employee was out of control. Instead, Wherry called the security department late that evening and instructed them to respond to the incident on Monday, January 29. Wherry did not inform security that he had known about the incident for over a week. UPS missed the ten-day deadline and settled the employee's grievance by allowing him to return to work. UPS immediately investigated the chain of command and learned that Wherry knew about the complaint for over one week during the limited ten-day period before he took any action. Wherry was demoted shortly thereafter. No reasonable person would conclude that Wherry was actually demoted because he advocated for Goree to get a promotion the previous summer.

We note Wherry's contention that he proved that UPS's stated reason for demoting him was pretextual. He claims that the employee who used the racial slurs could not be terminated for such an offense, regardless of his delay, because of a

provision in the collective bargaining agreement defining certain "cardinal sins" that warrant termination. However, we conclude that Wherry, at best, "created only a weak issue of fact as to whether the employer's reason was untrue." *See Reeves*, 530 U.S. at 148. The evidence at trial demonstrated that UPS and the union have a longstanding difference of opinion as to whether the "cardinal sin" provision limits the ability of UPS to terminate employees for certain designated offenses, as Wherry suggests. Regardless of each employee's personal opinions as to whether using racial slurs would constitute a cardinal sin under the labor contract, the witnesses were in general agreement that UPS would terminate the employee under the circumstances presented here under *its* interpretation of the labor contract, even if it would face a subsequent battle with the union over the propriety of the termination. Even Wherry admitted at trial that if he had actually read the write-ups he was provided, detailing the racial slurs made by the employee, he would have terminated the employee himself "[b]ecause that no doubt would have been good cause to terminate." Most importantly, UPS did terminate the employee for using racial slurs and returned him to work only after settling his grievance. In sum, we discern little probative value in Wherry's attempt to prove that UPS's explanation was false. Wherry did not establish that UPS's stated reason for demoting him had no basis in fact, that it did not actually motivate the decision, or that it was insufficient to motivate the decision because other employees engaged in substantially the same conduct and were not demoted. *See Williams*, 465 S.W.3d at 119. Even taking the strongest legitimate view of the evidence and allowing all reasonable inferences in Wherry's favor, no reasonable factfinder would conclude that UPS's stated reason for demoting Wherry was in fact a coverup for a retaliatory motive and that his advocacy for Goree was the "but for" cause of his demotion. We therefore reverse the judgment in favor of Wherry on his claim for retaliation for protected activity. All other issues are pretermitted.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby affirmed in part, reversed in part, and remanded for further proceedings. Costs of this appeal are taxed one-half to the appellees, Mitch Goree and James Wherry and one-half to the appellant, United Parcel Service, Inc., and its surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE

45